[L.A. No. 29803. In Bank. Dec. 16, 1970.]

ROGER JON DIAMOND et al., Plaintiffs and Appellants, v.
FRANK BLAND, as Sheriff, etc., et al., Defendants and Respondents.

## COUNSEL

Roger Jon Diamond, in pro. per., for Plaintiffs and Appellants.

A. L. Wirin, Fred Okrand and Laurence R. Sperber as Amici Curiae on behalf of Plaintiffs and Appellants.

Stanford D. Herlick, County Counsel, Paul A. Grube, Jr., Deputy County Counsel, Lonergan, Jordan & Gresham, Allen B. Gresham and Lawrence M. Cohen for Defendants and Respondents.

## OPINION

MOSK, J.—This appeal from a judgment denying preliminary and permanent injunctions entered in the Superior Court of San Bernardino County presents a constitutional question of first impression in this state: May the owners of a privately owned shopping center deny all use of their premises to persons who desire, on those premises, to engage in First Amendment activities unrelated to the business of the center?

Plaintiffs are People's Lobby, Inc., a nonprofit California corporation, which at the time of the incident giving rise to this litigation was engaged in securing signatures on two anti-pollution initiative petitions, Roger Jon Diamond, attorney for People's Lobby, and William Duxler, a volunteer working for People's Lobby in its initiative campaign. Defendants are Homart Development Company which owns a shopping center in the City of San Bernardino called the Inland Center (Center), the security guard and manager of the Center, the Sheriff and District Attorney of San Bernardino County, and the Mayor and Chief of Police of the City of San Bernardino.

The Inland Center is located in a nonresidential area on wedge-shaped property bounded by an interstate highway, a commercial street, and flood control channel. The Center consists of a large parking lot and a totally covered, air-conditioned shopping complex or mall which contains three major department stores—Sears, The Broadway, and The May Company—and 72 single businesses. All of the stores have an unobstructed frontage on the covered "common aisleway." The mall area is surrounded by a six- to eight-foot wide sidewalk which is adjacent to the parking lot.

The covered mall area is open to the public during business hours by means of entry through unlocked doors. Prospective customers are encouraged to visit the mall, which features piped-in music, benches, at-

tractive 32-foot wide common aisleways, and occasional business promotions and displays. No admission is charged for entry to the mall area and no purchases are required as a condition to entry. On the average, 25,000 persons visit the Center every day, coming from a market area of one million people living in places as far from the Center as 75 miles. The Inland Center is the largest shopping center in San Bernardino County.

Under Homart's regulations, all activity apart from regulated, mutually beneficial business promotions and displays, whether by tenants or strangers, is forbidden on the premises of the Center. The policy is intended to avoid any possible congestion or disturbance which might interfere with amiable shopping by customers, and it is applied without discrimination to all varieties of charitable, religious, fraternal, social, and political groups that seek to use the Center's property for any forms of solicitation or discussion.

On October 28 and 29, 1969, representatives of People's Lobby, Inc. requested permission to gather signatures for an initiative petition and to disseminate information in connection therewith on the Center premises. Specifically, Homart was asked to permit plaintiffs to set up a card table in the mall area or on the uncovered sidewalk for the purpose of gathering signatures and distributing leaflets. Plaintiffs assured Homart that their activities would be orderly and would result in no obstruction of normal Center activities. The requests were denied.

On October 30, 1969, two representatives of the People's Lobby, accompanied by a photographer and a newspaper reporter, entered the Center, set up a card table in the mall area, and proceeded to solicit signatures on the petition, collect donations, and distribute literature. Within a few minutes, the Center's security officer approached and demanded that they cease their activities and leave the Center. They complied by moving their table from the mall area to the exterior sidewalk. Again they were ordered to leave, and they did.

The entire occurrence lasted about half an hour during which time numerous persons signed the petitions. There was no disturbance or disruption of the activities of the Center and no departure from the norm of the mall, other than the existence of the table and the gathering of persons around it to sign the petitions, receive related literature, and contribute to the anti-pollution campaign. The trial court found only that the "use sought involved *potential* obstruction and interference with the use of the property." (Italics added.)

No arrests were made as a result of the incident and the representatives of People's Lobby left the Center after the security officer's second demand that they do so. However, all parties agreed that, if plaintiffs had not com-

plied with the security officer's demand, police assistance would have been requested. The chief of police testified that he would have removed persons from the Center at the request of Homart if they were in violation of any city ordinance or state statute defining trespass. Penal Code section 602, subdivision (*1*), defines trespass to include "[e]ntering and occupying real property or structures of any kind without the consent of the owner, his agent, or the person in lawful possession thereof." Therefore, the issues raised by the instant case do not differ substantially from those that would have been involved had plaintiffs been arrested upon refusal to leave the Center.

On November 5, 1969, plaintiffs filed a complaint for injunctive and declaratory relief, alleging that defendants' refusal to permit them to use the Inland Center premises to solicit signatures on their initiative petitions and disseminate information in connection therewith was in violation of their constitutional rights under the First and Fourteenth Amendments. The trial court denied a request for a temporary restraining order and, after a hearing, judgment was entered denying preliminary and permanent injunctions.

█ At the outset, we face a threshold question of mootness. January 26, 1970, was the original deadline for the securing of signatures on plaintiffs' initiative petitions in time for the 1970 election, and, therefore, it might appear at first blush that the case is now moot. However, in briefs both plaintiffs and defendants urge that the case should not be considered moot because of the likelihood of recurrence of conflict between the parties regarding the rights of plaintiffs and others to engage in free speech activities on the property of the Center. (See *Moore* v. *Ogilvie* (1969) 394 U.S. 814, 816 [23 L.Ed.2d 1, 4, 89 S.Ct. 1493]; *Eye Dog Foundation* v. *State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 541 [63 Cal.Rptr. 21, 432 P.2d 717].) In addition, plaintiffs have filed a new petition with the Secretary of State and have announced resumption of a campaign to qualify an initiative measure for the next state election. Therefore, we find, the matter is not moot.

Turning to the merits, it is plaintiffs' contention that applicable case precedent interpreting the First Amendment precludes defendants from absolutely prohibiting on shopping center premises speech activities which may not be absolutely barred from the public streets and parks. █ We conclude that prevailing authority compels our rejection of the proposition that owners of a shopping center may impose blanket and total prohibition on the exercise of First Amendment activities on shopping center property.

We start from the premise that peaceful and orderly solicitation of signatures, discussion of issues, and distribution of information are First

Amendment protected activities which may not be prohibited broadly and absolutely on public streets, parks, and similar public places traditionally associated with the exercise of First Amendment rights. (See *Food Employees* v. *Logan Plaza* (1968) 391 U.S. 308, 313, 315 [20 L.Ed.2d 603, 608, 610, 88 S.Ct. 161]; *Hague* v. *C.I.O.* (1939) 307 U.S. 496 [83 L.Ed. 1423, 59 S.Ct. 954].) We must decide whether the Inland Center, because of its private ownership, may insulate itself from such protected activities.

In *Marsh* v. *Alabama* (1946) 326 U.S. 501 [90 L.Ed. 265, 66 S.Ct. 276], the United States Supreme Court determined that the owners of a company town could not prevent the exercise of First Amendment rights on privately owned streets in the business district; therefore, it was held that a member of Jehovah's Witnesses could not be absolutely prohibited from distributing religious literature on the streets of the town. The court recognized that under some circumstances property that is privately owned may be treated as though it were publicly held, at least for First Amendment purposes: "Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it. . . . Whether a corporation or a municipality owns or possesses the town the public in either case has an identical interest in the functioning of the community in such manner that the channels of communication remain free. . . .

"Many people in the United States live in company-owned towns. . . . There is no more reason for depriving these people of the liberties guaranteed by the First and Fourteenth Amendments than there is for curtailing these freedoms with respect to any other citizen. . . . In our view the circumstance that the property rights to the premises where the deprivation of liberty, here involved, took place, were held by others than the public, is not sufficient to justify the State's permitting a corporation to govern a community of citizens so as to restrict their fundamental liberties and the enforcement of such restraint by the application of a state statute." (Fns. omitted.) (*Id.* at pp. 506, 507, 508-509 [90 L.Ed. at pp. 268, 269-270].)

Defendants concede that *Marsh* protected all First Amendment activities on the privately owned streets of the company town, regardless of any special relationship to the business of the town, but they contend that *Marsh* is distinguishable from the instant case which involves a privately owned shopping center and not an entire company town. They assert that in a company town there are no alternative effective channels of communication, while the customers and employees of a shopping center leave it

each day and return to communities where they may be-exposed to First Amendment communications on public streets, sidewalks, and parks.

It cannot be denied that there are distinctions between a company-owned town and a shopping center with regard to the availability of public property in the surrounding community, but the differences have been diluted by subsequent United States Supreme Court decisions. In *Food Employees* v. *Logan Plaza, supra,* 391 U.S. 308, the court applied the principles of *Marsh* to invalidate a shopping center's blanket prohibition of picketing on its premises. Limiting its holding to the facts before it— union picketing of an employer whose business was located within the shopping center—the court drew broad parallels between the company town in *Marsh* and the shopping center in *Logan:* "The similarities between the business block in *Marsh* and the shopping center in the present case are striking. . . . The shopping center here is clearly the functional equivalent of the business district of Chickasaw involved in *Marsh.*

"It is true that, unlike the corporation in *Marsh,* the respondents here do not own the surrounding residential property and do not provide municipal services therefor. . . . Thus, unlike the situation in *Marsh,* there is no power on respondents' part to have petitioners totally denied access to the community for which the mall serves as a business district. This fact, however, is not determinative. In *Marsh* itself the precise issue presented was whether the appellant therein had the right, under the First Amendment, to pass out leaflets in the business district, since there was no showing made there that the corporate owner would have sought to prevent the distribution of leaflets in the residential areas of the town. . . .

"We see no reason why access to a business district in a company town for the purpose of exercising First Amendment rights should be constitutionally required, while access for the same purpose to property functioning as a business district should be limited simply because the property surrounding the 'business district' is not under the same ownership." (*Id.* at pp. 317-319 [20 L.Ed.2d at pp. 611-612].)

The foregoing language clearly indicates that for First Amendment purposes the Supreme Court could see few relevant differences between the company town in *Marsh* and the shopping center in *Logan.*[1] Although the court understandably limited its holding to the facts before it, *Logan* is persuasive authority for the proposition that the right to engage in

[1]It is noteworthy that the shopping center in *Logan* was substantially smaller than the Inland Center. At the time of the litigation in *Logan,* only Sears and Weis Markets, Inc. were located in that shopping center; 15 additional businesses had joined the center at the time of the Supreme Court's decision.

peaceful and orderly First Amendment activities on the premises of shopping centers should be protected to the same extent as the right recognized by the court in *Marsh* for residents of company towns. The implication is clear from *Logan* that modern-day shopping centers, serving as the business districts for the surrounding residential communities, have important public functions, and their owners may not rely on their private ownership to justify blanket prohibitions on First Amendment activities that could lawfully be conducted on public property. Indeed, in many instances the contemporary shopping center serves as the analogue of the traditional town square.

More recently, in *In re Cox* (1970) *ante,* p. 205 [90 Cal.Rptr. 24, 474 P.2d 992], we have had occasion to consider the constitutional implications of the role of the present-day shopping center. We held that a shopping center, like a city, could not engage in arbitrary discrimination on the basis of race, politics or dress in violation of the equal protection clause of the Fourteenth Amendment. We explicitly recognized that "[t]he shopping center has undertaken the public function of providing society with the necessities of life and has become the modern suburban counterpart of the town center." (*Id.* at p. 216, fn. 11.) "In undertaking to provide the necessities and amenities of life, the shopping center performs an important public function. . . . Our modern society has become so interdependent and interrelated that those who perform a significant public function may not erect barriers of arbitrary discrimination in the marketplace." (*Id.* at p. 218.)

Finally, in *Tanner* v. *Lloyd Corporation* (D.Ore. 1970) 308 F.Supp. 128, the federal court considered facts almost identical to those before us and, relying on *Marsh* and *Logan,* held that a shopping center could not constitutionally prohibit private persons from distributing handbills within the center mall. "The sole distinction between this case and *Marsh* is that this case involves a shopping center whereas *Marsh* involved a town. I do not believe that distinction should cause a different result. . . . In my view, an owner who opens his land to the general public for business purposes, to the extent that the land becomes the functional equivalent of a public business district, gives up the right to prohibit the distribution of literature . . . . If this were not true, the public need for uncensored information, on which *Marsh* was based, could be frustrated." (*Id.* at p. 132.)[2]

---

[2]Defendants also attempt to distinguish *Marsh* by insisting these plaintiffs can assert their First Amendment rights by means of mass media. It seems evident that mass media are particularly inappropriate for plaintiffs' purposes: no one has suggested how signatures can be obtained on initiative petitions by means of newspapers, radio or television.

Thus, the rationale of *Marsh*, plus the analogy drawn between the company town and the shopping center by *Logan* and related cases, compel a decision to grant injunctive and declaratory relief. But we need not rely solely on the foregoing approach; additional instructive precedent supports plaintiffs' request for protection of their First Amendment rights.

In *Logan*, the Supreme Court held that a shopping center could not absolutely prohibit union picketing of a business located within the Center. The court expressly declined to decide whether "respondents' property rights could, consistently with the First Amendment, justify a bar on picketing which was not thus directly related in its purpose to the use to which the shopping center property was being put." (391 U.S. at p. 320, fn. 9 [20 L.Ed.2d at p. 613].) In *Schwartz-Torrance Investment Corp. v. Bakery & Confectionery Workers' Union* (1964) 61 Cal.2d 766 [40 Cal.Rptr. 233, 394 P.2d 921], we reached an identical result four years prior to the Supreme Court decision in *Logan*. Striking a balance between the interests of union members in picketing an employer and the desire of the owners of the center to prohibit peaceful picketing, we held that the owner of a shopping center could not enjoin as a trespass the peaceful picketing by union members of premises in the center leased by the owner to the employer of the union members. Most recently, in *In re Lane* (1969) 71 Cal.2d 872 [79 Cal.Rptr. 729, 457 P.2d 561], we extended the principles of *Logan* and *Schwartz-Torrance* to the privately owned sidewalk in front of a large supermarket and held that unobstructive union picketing and handbilling on the sidewalk were protected under the First Amendment as against the property rights of the owner-employer.

This series of cases involving union picketing in shopping centers establishes constitutional protection for picketing and other First Amendment activities which are related in their purpose to the normal use to which the shopping center property is devoted. A logical query then arises as to whether these cases provide an additional source of authority in support of plaintiffs' right to solicit signatures and distribute information within the Inland Center. Defendants contend that *Logan, Schwartz-Torrance* and *Lane* are clearly distinguishable from the instant action because the First Amendment activity conducted by plaintiffs here was not directly related to the purposes for which the Inland Center properties were being used.

Indisputably, defendants have isolated a relevant difference between the precedents and the instant case, but the question remains whether the difference justifies the holding of the trial court that defendants are free to prohibit all nonbusiness-related First Amendment activities on their premises. Both *Schwartz-Torrance* and *Logan* did rely in part on the fact

that the unions involved were picketing businesses located within the shopping centers, but that circumstance was relevant only because it strengthened the interest of the petitioners in their exercise of the First Amendment activities inside the shopping centers. When the activity to be protected is the right to picket an employer, the location of the employer's business is often the only effective locus; alternative locations do not call attention to the problem which is the subject of the picketing and may fail to apply the desired economic pressure.

Plaintiffs in the instant case cannot claim that effective alternative sites for their First Amendment activities are unavailable. If plaintiffs are barred from circulating their initiative petitions in the Inland Center, they are free to do so on the public streets and sidewalks in the surrounding community. Nevertheless, it is clear that they have a substantial interest in being able to solicit signatures and distribute information at the Center. Access to the thousands of persons who congregate on foot daily at the Center is a highly significant vehicle for the dissemination of ideas, particularly when the activity requires time for discussion and a place for obtaining signatures. The Inland Center serves as the primary business district for a large surrounding community and is the most effective and desirable location for the conduct of plaintiffs' First Amendment activities.

To be balanced against the interest of plaintiffs in the exercise of their First Amendment rights at the Center is the interest of defendants in the complete prohibition of nonbusiness-related activities. Language in *Schwartz-Torrance, Logan,* and *Lane* defines the scope of the property interest possessed by the owners of shopping centers and is no less applicable to defendants in the case at bar. In *Schwartz-Torrance,* we stated: "[T]he countervailing interest which [the owner] endeavors to vindicate emanates from the exclusive possession and enjoyment of private property. Because of the public character of the shopping center, however, the impairment of [the owner's] interest must be largely theoretical. [The owner] has fully opened his [*sic*] property to the public. . . . [It] suffers no significant harm in the deprivation of absolute power to prohibit peaceful picketing upon property to which it has invited the entire public. . . . The Supreme Court of the United States in *Marsh* . . . describes the diluted nature of a property right in premises opened to the public." (61 Cal.2d at p. 771.) We concluded, "the interest of the [owner] lies in the shadow cast by a property right worn thin by public usage." (*Id.* at pp. 774-775.)

The Supreme Court in *Logan* used similar language to describe the property interest of the owners which was to be balanced against the union's interest in the exercise at the center of its First Amendment rights: "The sole justification offered for the substantial interference with the

effectiveness of petitioners' exercise of their First Amendment rights . . . is respondents' claimed absolute right under state law to prohibit any use of their property by others without their consent. However, unlike a situation involving a person's home, no meaningful claim to protection of a right of privacy can be advanced by respondents here. Nor on the facts of the case can any significant claim to protection of the normal business operation of the property be raised. Naked title is essentially all that is at issue." (391 U.S. at p. 324 [20 L.Ed.2d at p. 615].) In *Lane,* we quoted from *Logan* and balanced the "naked title" of the owners of the supermarket against the "paramount and preferred place given to the First Amendment freedom of speech right in our democratic system . . . ." (71 Cal.2d at p. 878.)

Therefore, although there is arguable merit to defendants' position that plaintiffs' interest in the exercise of their First Amendment rights at the Center may be less compelling than the First Amendment interests involved in *Schwartz-Torrance, Logan,* and *Lane,* their contention does not justify striking the balance in favor of defendants' property rights. As we have explained, plaintiffs' interest is of significant constitutional dimension, while defendants' concern is no stronger than the interests of the property owners in *Schwartz-Torrance, Logan,* and *Lane.* There is no allegation that the plaintiffs' conduct was in any way disruptive of the business activities carried on at the Center; and the trial court's finding of a "potential obstruction and interference with the use of the property" does not justify a blanket bar on all First Amendment activities, but merely suggests reasonable regulation of those activities.

The foregoing analysis indicates that we may not ignore the impact of *Schwartz-Torrance, Logan,* and *Lane* solely because those cases involved First Amendment activities related to the purposes for which the affected properties were being used. Furthermore, there is persuasive California authority which rejects the tests relied on by defendants to distinguish *Schwartz-Torrance, Logan,* and *Lane* from the case at bar. *In re Hoffman* (1967) 67 Cal.2d 845 [64 Cal.Rptr. 97, 434 P.2d 353] involved the constitutionality of a municipal ordinance which limited permissible activities in railway stations to those related to railroad business. We held that the ordinance could not be applied, consistently with the First Amendment, to prohibit defendants from peacefully distributing antiwar leaflets at Union Station in Los Angeles, a privately owned railway station. In reaching this result, we expressly rejected the city's contention that the station could be limited to railroad-related uses so long as defendants were able to disseminate their views at alternative locations. "The primary uses of municipal property can be amply protected by ordinances that prohibit

activities that interfere with those uses. Similarly, the primary uses of railway stations can be amply protected by ordinances prohibiting activities that interfere with those uses. In neither case can First Amendment activities be prohibited solely because the property involved is not maintained primarily as a forum for such activities. . . .

"Similarly, in the present case, the test is not whether petitioners' use of the station was a railway use but whether it interfered with that use. . . . Noise and commotion are characteristic of the normal operation of a railway station. The railroads seek neither privacy within nor exclusive possession of their station. They therefore cannot invoke the law of trespass against petitioners to protect those interests . . . .

"Had petitioners in any way interfered with the conduct of the railroad business, they could legitimately have been asked to leave. . . . It is immaterial that another forum, equally effective, may have been available to petitioners. . . . Absent the presence of some conflicting interest that could be protected in no other way, petitioners have the right to choose their own forum." (*Id.* at pp. 850, 851, 852 and fn. 7.)

Hence, in *Hoffman* we held that the bare title of the owners of the railway station was not a sufficient interest to outweigh the interest of petitioners in the exercise of First Amendment rights at the station. We reached that conclusion even though the particular speech activities involved were not directly related to the normal uses of the affected business property. (See also *Wolin* v. *Port of New York Authority* (2d Cir. 1968) 392 F.2d 83; cf. *Burnside* v. *Byars* (5th Cir. 1966) 363 F.2d 744.)

Defendants would have us distinguish *Hoffman* on the ground that the potential for obstruction and interference occasioned by the exercise of unrelated First Amendment rights in a shopping center is much greater than that potential in a railway station. They contend that the normal functioning of business in a shopping center demands a more rigid standard of order and tranquility than the business activities at railway stations, up to recent years characterized by noise and commotion. Therefore, they conclude that their interests in prohibiting activities unrelated to business in the Inland Center are greater than the concerns of the owners of Union Station.

Though debatable, it may be conceded that a large shopping center is not likely to be as noisy, crowded, or active as the railway station in *Hoffman,* but the difference is one only of degree. Certainly, a shopping center does not require the same perfect order, silence, and contemplative environment as, for example, a public library or courthouse. A shopping center to which the public is invited and where thousands of persons come to shop, browse, stroll, and talk is no more likely to be disrupted by peace-

ful and orderly circulation of a petition than a railway station; and the business of a railway station, as much as that of a shopping center, can be disrupted by *unregulated* First Amendment activity, whether that activity is related or unrelated to the uses of the affected property. Thus the owner of a shopping center, like the owner of a railway. station, has no legitimate interest in absolutely prohibiting all First Amendment activities on his premises.

It bears repeating that no evidence was presented to the trial court that plaintiffs' activities actually interfered with the normal business operations of the Inland Center.[3] Plaintiffs do not contend that they are entitled to use private property for the dissemination of ideas without limitations imposed by reasonable regulations designed to protect the business activities of the Center. Each of the cases upon which we rely—*Marsh, Logan, Schwartz-Torrance, Lane,* and *Hoffman*—presumed that the property owners involved were free to impose "reasonable regulations" upon the exercise of First Amendment rights on their premises; and each of the cases emphasized that disruptive First Amendment activities may be prohibited by the owners of private property opened to the public.

■ We impose no unrealistic burden on the operators of shopping centers in insisting that their control over First Amendment rights be exercised, if at all, through reasonable regulations calculated to protect their business interests rather than through absolute bans on all nonbusiness-related activities. Shopping centers, like railway stations, are not incapable of regulating permissible activities. If regulations could not be designed, the decisions in *Schwartz-Torrance* and *Logan* might have produced chaos, as labor unions and other groups would have been free to picket businesses in the shopping centers without reasonable limitation as to time, place, or manner. Moreover, the trial court findings in the instant action demonstrate the ability of Inland Center to regulate the various sales promotions and displays that are permitted in the common aisleways: "In every instance where a promotion is held, it is closely regulated as to time, date, location, number of people or exhibits involved, manner of presentation and security factors." Similar regulations, if not repressive in scope, can be devised to protect Inland Center from actual or potential danger of First Amendment activities being conducted on its premises in a manner calculated to disrupt normal business operations and to interfere with the convenience of customers.

■ We conclude that the line of cases beginning with *Marsh* and including *Schwartz-Torrance, Logan, Lane,* and *Hoffman* compels a reversal

---

[3]The "obstruction" in this case is comparable to that involved in *In re Wallace* (1970) *ante,* pp. 289, 295 [90 Cal.Rptr. 176, 475 P.2d 208]

of the judgment rendered by the trial court and entitles plaintiffs to a judgment confirming their right to circulate initiative petitions and to engage in other peaceful and orderly First Amendment activities on the premises of the Inland Center[4] and declaring that defendants may not constitutionally impose a prohibition on all First Amendment activity on the premises of their shopping center. Unless there is obstruction of or undue interference with normal business operations, the bare title of the property owners does not outweigh the substantial interest of individuals and groups to engage in peaceful and orderly First Amendment activities on the premises of shopping centers open to the public.

The judgment is reversed and the trial court is directed to enter judgment for plaintiffs consistent with the views expressed in this opinion.

Wright, C. J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

McCOMB, J.—I dissent. I would affirm the judgment for the reasons expressed by Mr. Justice Gardner in the opinion prepared by him for the Court of Appeal in *Diamond* v. *Bland* (Cal.App.) 87 Cal.Rptr. 97.

---

[4]Although the parties have not raised the issue, we have not overlooked consideration of the concept of state action. It is elementary constitutional doctrine that the First and Fourteenth Amendments protect individuals only from state action which inhibits their free speech rights. Here we find state action of a character comparable to that in *Logan, Schwartz-Torrance,* and *Lane.* We explained in *In re Cox, supra, ante,* pp. 205, 217, fn. 11: "In *Logan Valley, Lane* and *Schwartz-Torrance,* the United States Supreme Court and this court found 'state action' under the Fourteenth Amendment in a shopping center's refusal to permit the exercise of First Amendment rights in such public areas as sidewalks, parks, and malls."