293 A.2d 493.

HOMART DEVELOPMENT COMPANY *vs.* DANIEL FEIN *et al.*

JULY 20, 1972.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

POWERS, J.[1]  The plaintiff corporation is the owner and operator of eight large shopping centers which are located in various parts of the country.  One of these, familiarly known as Midland Mall, is located in the city of Warwick in this state.

Midland Mall, hereinafter referred to as the Mall, consists of 45 acres which are so terraced as to provide parking facilities for 3,250 cars on an upper and lower level. Entrances to and exits from the Mall are located on Route 2 and Route 113.  There is a small key shop located near the main building on the upper level of the parking lot and a large garage-type building on the lower level devoted to the sale of tires, batteries and automobile accessories. The main building, situated on both levels, is a totally covered air-conditioned shopping complex which houses a diversification of 73 stores, shops, eating places and the like. Also part of the main building are the Barnsider Restaurant and the Midland Cinema.  All of these business establishments are leased by plaintiff to individual tenants who conduct their own businesses.  Each such business establishment has an unobstructed frontage on the covered common aisleways while several have an additional entrance from the parking lot.  This principal structure is surrounded by a broad sidewalk which abuts the parking lot on both levels.

The stores and shops are open daily from 9:30 in the

[1]Subsequent to the approval of this opinion in conference, but before the editing procedures of this court were completed, the United States Supreme Court filed *Lloyd Corp. v. Tanner,* 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972), which, by its holding, was dispositive of the instant defendants' appeal.

Nevertheless, it seemed advisable to this court that our views on the question should be reported.

morning to 9:30 in the evening Monday through Saturday, and a few are open on Sunday. The Barnsider Restaurant is open until 1:30 in the morning and the Midland Cinema is also open evenings after the stores and shops are closed. The parkings lots are never closed. Taken together, these various concessions attract an average total of 18,000 persons daily.

Within the main building, there are, in addition to the leased commercial establishments, some scattered benches as well as washrooms for the comfort and convenience of the Mall's patrons.

In the summer of 1970, defendants, Daniel Fein, John Powers and Joseph Traugott, were endeavoring to have their names placed on the ballot for the November general election as candidates of defendant Rhode Island Socialist Workers Party, for the offices of United States Senator, Governor and Lt. Governor, respectively. Consonant with these endeavors, Fein and Powers went to the Mall on July 27 and 30 where they took up separate stations at entrances and exits to the main building for the purposes of obtaining signatures on their nomination papers and to acquaint the people they solicited with the aims of their political party.

On July 27, they were told by plaintiff's security guard that it was plaintiff's policy not to permit solicitation of any kind. In response to this, they asked to speak with plaintiff's manager and, the latter not being available, they were taken to talk with plaintiff's promotion director at the Mall. This official explained that it was plaintiff's undeviating national policy never to knowingly permit solicitations of any nature. The defendants, Fein and Powers, left as requested but, consulting an attorney, were advised that their activities fell within the protection of the first amendment to the United States Constitution. So all three candidates returned on July 30 to continue their efforts to obtain signatures and solicit support for the

Rhode Island Socialist Workers Party. While thus engaged on that day, they learned that plaintiff was initiating legal action and, having been there some four hours, decided to leave.

The plaintiff, in point of fact, filed a complaint in Kent County Superior Court on said July 30. It sought to have defendants temporarily and permanently enjoined from conducting their political activities on the Mall and prayed that, pending hearing on the complaint, defendants be temporarily restrained and enjoined.

A restraining order was entered and the case assigned to August 4 for hearing on the preliminary injunction.

The hearing began on said August 4 and continued through August 5 and into August 6. Both sides introduced oral and documentary evidence which, in the view taken thereof by the trial justice, resulted in establishing certain ultimate facts.

No useful purpose would be served by detailing the evidence adduced by the parties. We have heretofore set forth a description of the Mall together with a general statement of the manner in which it is operated. It suffices to note that this description of the Mall and the manner in which it is operated, as well as other findings of fact made by the trial justice were placed in the record through competent evidence. Consequently, defendants make no contention that the trial justice's findings of fact are clearly erroneous. Rather, they argue, in effect, that taking the facts to be as the trial justice found them, his decision is contrary to the applicable law. Leaving their argument in this regard for consideration hereafter, we note here that the trial justice granted plaintiff's prayer for a preliminary injunction and from the judgment accordingly entered, defendants appealed to this court, electing to treat the hearing on the prayer for a preliminary injunction as a hearing

on the merits as authorized by G. L. 1956 (1969 Reenactment) §9-24-7.

Before turning to a consideration of the arguments made by defendants in support of their appeal and the cases on which they rely, it will be helpful to examine the trial justice's decision. He found that plaintiff, consistent with its national policy, had a local policy which it enforced without discrimination of not permitting either its tenants nor visitors to the Mall to carry on solicitations of any kind. This policy, he further found, was based on and motivated by plaintiff's determination to provide the shopping public with a place where actual shopping or window shopping or browsing, which, hopefully would lead to business for its tenants, could be pursued in leisurely fashion, free from the distractions common to public shopping districts.

Continuing, he found that the evidence established that exhibitions and promotions which plaintiff permitted from time to time to be conducted on its premises not occupied by tenants were projects which would be mutually beneficial to the promoters and plaintiff. Moreover, all such promotions that had been allowed were carried on pursuant to a written contract by the terms of which the promoter was required to pay a consideration, unless expressly waived by plaintiff.

Based on the testimony of defendants Traugott and Fein, the trial justice found that there were numerous public business districts, parks, beaches, as well as other but unrestricted privately owned shopping centers where defendants were free to carry on their endeavors unhindered. He also accepted their testimony that, although they would be peacefully conducted, defendants would continue their activities at the Mall unless enjoined.

With these factual determinations in mind, the trial justice turned to a consideration of defendants' contention that the activities sought to be enjoined were a valid exercise

of first amendment rights to free speech and assembly. He reviewed the several cases on the authority of which defendants rested their position and rejected each of them as being significantly distinguishable on their facts.

So doing, he made the point that the first amendment, although sometimes occupying a preferred position by reason of the facts in a given case, must, in other instances, yield to other constitutional guarantees when, in the circumstances of the case, the latter, to be meaningful, must be given priority. In this connection, he cited the case of the people's right to know as guaranteed by the first amendment coming in conflict with the right of an accused to a fair and impartial trial as guaranteed by article VI of amendments to the Constitution of the United States.

From this, as well as his reference to other instances where the first amendment comes in conflict with other constitutional guarantees, the trial justice concluded that the cases relied on by defendants clearly demonstrated that, in any given case, it was the duty of the court to balance conflicting constitutional guarantees and resolve such conflict by reaching a decision that would be consistent with the constitutional rights of all the parties.

Stated otherwise, he viewed the cases relied on by defendants as standing for the proposition that just as the constitution guarantees equality of standing thereunder to all whom it is designed to serve, so too equality of solemnity inures in each of its protective guarantees. Thus, it is not the purpose to be served by any particular guarantee which, on occasions, gives that provision preferred standing. It is rather, by reason of the facts of the case, that preferred position results.

Taking as his premise that devoting private property to a profitable commercial use falls within the protection of the fifth amendment, assuming such use is not contrary to a due process regulation, the trial justice proceeded to

strike a balance between plaintiff's non-discriminating policy of refusing to consent to the use of the Mall for first amendment protected activities, and defendants' right to free speech and assembly guaranteed by the first amendment. So doing, he found on the one hand that plaintiff's policy was part and parcel of its profit oriented promotion, namely, the attracting of shoppers by providing a place where their interests could be pursued comfortably, leisurely and, nominally, free from unrelated distractions.

. On the other hand, he found that defendants were seeking to invoke the protection guaranteed by the first amendment for activities wholly unconnected with the business of the Mall and indeed, that the purposes to be served by such protection came down to a matter of convenience. This latter conclusion rested on the testimony of defendants Fein and Traugott who readily acknowledged that there were any number of avenues, both public and private, where they would be free to pursue their endeavors without objection, but that they preferred to use the Mall because it afforded the best opportunity to come in contact with the greatest number of people in the shortest period of time.

In light of the foregoing, the trial justice held that to give the first amendment a preferred position over the fifth would be to strike an unbalance for which he could find no justification. We agree.

The defendants, in support of their appeal to this court, vigorously contend that the decision of the trial justice constitutes a clear error of law in that it is based on an unsound interpretation of the cases on which defendants rely. In this regard, it should be noted that in their oral arguments and briefs, defendants rely on the same cases which were argued to and rejected by the trial justice with one exception. This exception is *Diamond* v. *Bland,* 3 Cal.3d 653, 477 P.2d 733 (1970). The reason for this ex-

ception, as well as consideration of the merits of that case will, for the sake of continuity, be deferred pending a discussion of the cases on which it was decided. Prescinding for the moment from a review of the cases on which defendants rely unavailingly, we think it will be helpful to put their basic position in focus.

Taking any privately operated business establishment located on Westminster Street in Providence, and the sidewalk which it abuts as an example, defendants equate the principal building at the Mall with the business establishment on Westminster Street and the sidewalks and parking lot surrounding the principal building at the Mall with the Westminster Street sidewalk.

With this as their premise, they argue that while the invitation to the public to visit the Westminster Street shops is limited to the purposes for which the shop is opened to the public, such limitation does not extend to the public's use of the sidewalk.

Consequently, it is defendants' position, the walks and parking lot surrounding the stores, shops, eating establishments, and the Midland Cinema, are as available for the exercise of first amendment rights as is the sidewalk on Westminster Street.

This reasoning completely disregards the fact that the Westminster Street sidewalk is a public way for pedestrians whose use of it may or may not relate to the business establishment fronting thereon. Contrariwise, the parking lot and sidewalks, strategically located on the 45 acres owned by plaintiff are there but for one purpose, and that is to accommodate those who are invited to visit the Mall in furtherance of its profit-motivated operation. As Mr. Justice Black, speaking of the parking lot of a shopping center to which the public were invited by the defendants in *Amalgamated Food Employees Union Local 590* v. *Lo-*

*gan Valley Plaza, Inc.,* 391 U. S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968), observed in his dissent:

> "But the whole public was no more wanted there than they would be invited to park free at a pay parking lot." *Id.* at 332, 88 S.Ct. at 1616, 20 L.Ed.2d at 620.

It seems to us therefore that the public domain which is equivalent to the Westminster Street sidewalk is the public way which abuts the 45 acres. If this is not so, it logically follows that the entire Mall, business premises included, is available to defendants and everyone else who might wish to use it for the exercise of first amendment rights not related to the purposes for which the Mall is operated. Such a result would constitute a judicial diluting of the protection against confiscation of private property guaranteed by the fifth amendment to the Constitution of the United States.

Nevertheless, defendants vigorously assert that however much their position may have been open to question before the issue was resolved in their favor, it was so resolved by the United States Supreme Court in *Marsh* v. *Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), subsequently followed and expanded in *Amalgamated Food Employees Union Local 590* v. *Logan Valley Plaza, Inc., supra,* and found to be in point by the United States Court of Appeals for the Second Circuit in *Wolin* v. *Port of New York Authority,* 392 F.2d 83 (2d Cir. 1968).

We, as did the trial justice, have carefully examined the cases in question and think them to be so factually distinguishable as to not support defendants' position.

So deciding, we think it incumbent upon us to discuss the view that we take of the cases on which defendants rely.

In the first such case the United States Supreme Court was passing on the question of whether a state, consistent with the first and fourteenth amendments could impose criminal punishment on a person who undertakes to dis-

tribute religious literature on the premises of a company-owned town contrary to the wishes of the town's management.

Grace Marsh, a Jehovah's Witness, was arrested for and convicted of violating an Alabama statute which made it a criminal trespass for one to enter or remain on the premises of another after having been warned not to do so.

The arrest took place on the sidewalk of a business street in the town of Chickasaw, Alabama. Chickasaw, a suburb of Mobile, Alabama, was wholly owned by Gulf Shipbuilding Corporation, a private corporation. Consistent with that corporation's policy, its representative, who managed Chickasaw, had caused to be posted in the stores of the corporation a notice which read:

> " 'This Is Private Property, and Without Written Permission, No Street, or House Vendor, Agent or Solicitation of Any Kind Will Be Permitted.' "

Appellant Marsh, who wished to distribute religious literature, sought and was denied permission. Nevertheless, she took up a position on the sidewalk near the post office and passed out her literature insisting that the company could not interfere with her first amendment right to the exercise of religious freedom. She was asked to leave, refused and was arrested as aforesaid.

In passing on her appeal, the United States Supreme Court, speaking through the late Mr. Justice Black stated at 505, 66 S.Ct. at 278, 90 L.Ed. at 268:

> "Our question then narrows down to this: Can those people who live in or come to Chickasaw be denied freedom of press and religion simply because a single company has legal title to all the town?"

The learned justice, pointing to its places of residence, business district, including a United States post office, a system of sewers, together with streets and sidewalks for the convenience of its residents or visitors, including persons who might just be passing through, noted that Chick-

asaw, except for the fact that it was wholly privately owned, was in all other respects no different from any other American town.

Clearly, the Court noted, if all the places of residence, business, commerce, industry, and other indicia of a municipality were separately owned by a number of people, all those people together could not have set up a municipal government with sufficient power to pass an ordinance completely barring the distribution of religious literature. This being so, why, pondered the Court, should a regulation promulgated by a single owner of all such indicia have standing to abridge the first amendment rights of the residents and visitors to Chickasaw?

A majority of the Court were of the opinion that, consistent with the Constitution, no such distinction could be permitted. In support of this conclusion and stressing that open channels of communication are essential to all men in the preservation of a democracy, the majority took note of the fact that unnumbered thousands of people live in company-owned towns. They, no less than all other citizens, the majority declared, must be afforded ready access to those means by which a free government is maintained.

Again quoting Mr. Justice Black at 506, 66 S.Ct. at 278, 90 L.Ed. at 268:

> "The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it."

The instant defendants, understandably, seize on the last quoted sentence and urge in substance that we should consider it as being dispositive of the case at bar. We are in full accord with the proposition for which it stands, namely that the owner of private property may so devote that property to the use of the public generally as to give up those rights, which even the government may not unqualifiedly assert in its regulation of the public domain.

But, devoting it to a circumscribed commercial enterprise for the accommodation of such of the public as might be attracted for the purpose for which it exists, is materially different from making it the functional equivalent of a municipality. Other than the fact that business is conducted thereon, plaintiff's Mall has no resemblance to Chickasaw, Alabama. The streets and sidewalks of the latter were links which were open to use by the traveling public who had no interest in stopping there. The Mall, on the other hand, is a cul-de-sac, as it were, and its parking lot and sidewalks are unavailing for any purpose other than to serve those who enter the Mall in fulfillment of their and its mutual interest.

The record establishes, and the trial justice so noted, that there are, in the neighborhood of the Mall, other privately owned shopping centers where the owners thereof, offer no objection to the public's use of their premises for purposes other than those connected with their shopping centers. Although these centers also bear little resemblance to Chickasaw, Alabama, they do nevertheless represent a broader invitation to the public than that extended by plaintiff.

Thus, although neither plaintiff's Mall nor the other shopping centers to which attention is directed factually resemble the circumstances on which the majority reach their conclusion in *Marsh,* the variance between plaintiff's invitation to the public and that of its competitors does serve to point up acknowledgment of such distinctions in Mr. Justice Black's statement:

> "*The more* an owner, for his advantage, opens up his property for use by the public in general, *the more* do his rights become circumscribed by the statutory and constitutional rights of those who use it." (emphasis ours)

We conclude then that the holding of the majority in

*Marsh* v. *Alabama, supra,* is without application to the facts of the instant appeal.

We turn next to a consideration of defendants' contention that if plaintiff's policy is not in violation of the prohibition enunciated by the majority in *Marsh* v. *Alabama, supra,* it is violative of the *Marsh* rule as expanded by a majority of the Court in *Amalgamated Food Employees Union Local 590* v. *Logan Valley Plaza, Inc., supra.*

We have earlier in this opinion indicated that although *Amalgamated Food Employees Union Local 590* v. *Logan Valley Plaza, Inc., supra,* does represent an enlargement of the holding in *Marsh* v. *Alabama, supra,* such enlargement was confined by the Logan Valley court to a circumstance totally absent in the case at bar. At this juncture then, it is incumbent upon us to set forth not only the relevant factual distinction between *Amalgamated Food Employees Local 590* v. *Logan Valley Plaza, Inc., supra,* and the instant appeal, but to point as well to the language employed by the majority in reaching their decision in the case on which the instant defendants rely.

In December 1965, Logan Valley Plaza, Inc., hereafter referred to as *Logan,* was the owner of a large shopping center located near Altoona, Pennsylvania. It would appear from the facts as reported, that in their physical and operational characteristics there is nothing to distinguish Logan from the Mall owned by the instant plaintiff.

On December 8, 1965, Weis Markets Inc., hereinafter called Weis, became a tenant of Logan and opened a supermarket which was staffed by non-union employees. Nine days later, members and officers of Amalgamated Food Employees Union Local 590, hereinafter called the Union, began to picket Weis. The picketing was conducted for the most part in a parcel pickup area used by Weis customers and an adjacent portion of the parking lot provided by Logan for all shoppers. The picketing was peaceful and con-

sisted of the picketers carrying placards on which were printed protests against the non-union policy of Weis.

The picketing continued until December 27, 1965, on which date Logan and Weis obtained an ex parte restraining order from a judge of the Common Pleas Session of the Pennsylvania Court. Thereafter, an evidentiary hearing was held before said justice which resulted in the entering of an order continuing the ex parte relief indefinitely. It would appear that the injunction ran against the Union, its officers and members, and encompassed all the Logan Mall.

From that order the appellants appealed to the Pennsylvania Supreme Court which, except for some modification not material here, affirmed the order of the Common Pleas Court.

Thereafter, the Union, its officers and members petitioned the United States Supreme Court for review by way of certiorari, and that Court agreed to hear the case.

The issue as postured by Mr. Justice Marshall writing for the majority was substantially as follows: Can peaceful picketing of a business enterprise located within a shopping center be enjoined on the ground that it constitutes an unconsented invasion of the property rights of the owners of the land on which the center is situated?

It is unquestionably true, as defendants contend, that the decision reached by the majority asserts precedence therefore on the holding in *Marsh* v. *Alabama, supra.* This is apparent from Mr. Justice Marshall's statement that Logan was clearly the functional equivalent of the business district of Chickasaw involved in *Marsh,* and if the petitioners for certiorari had been vindicated as persons claiming the right to invoke first amendment protection for their exercise of free speech and assembly unrelated to the use to which Logan was put, there is little doubt but that

the case would stand as binding authority for the holding claimed for it by defendants here.

However, the circumstances are otherwise. As the opinion of the majority carefully points out, the petitioners were protesting against the non-union policy of Logan's tenant, Weis, at the only place where their protest could be realistically made. Such protests, in the opinion of the majority, were generally related to the business conducted at Logan; hence, incidental to the invitation Logan extended to the public.

That such was the thinking of the majority is, as we read their language, readily discernible.

Irresistibly persuasive of such construction are two carefully precise statements in the body of the opinion and a footnote made in conjunction with the first such statement. We quote:

> "All we decide here is that because the shopping center serves as the community business block 'and is freely accessible and open to the people in the area and those passing through,' *Marsh* v. *Alabama*, 326 U. S. at 508, the State may not delegate the power, through the use of its trespass laws, wholly to exclude those members of the public wishing to exercise their First Amendment rights on the premises in a manner and for a purpose generally consonant with the use to which the property is actually put." *Amalgamated Food Employees Union Local 590* v. *Logan Valley Plaza, Inc., supra* at 319-20, 88 S.Ct. at 1609, 20 L.Ed.2d at 612-13.

In emphasis of this declaration appears n.9:

> "⁹The picketing carried on by petitioners was directed specifically at patrons of the Weis Market located within the shopping center and the message sought to be conveyed to the public concerned the manner in which that particular market was being operated. We are, therefore, not called upon to consider whether respondents' property rights could, consistently with the First

Amendment, justify a bar on picketing which was not thus directly related in its purpose to the use to which the shopping center property was being put." *Id.* at 320, 88 S.Ct. at 1609, 20 L.Ed.2d at 613.

Continuing, the majority noted that by the end of 1966, shopping centers in the United States and Canada accounted for approximately 37 per cent of the total sales in those two countries, and concluded:

"These figures illustrate the substantial consequences for workers seeking to challenge substandard working conditions, consumers protesting shoddy or overpriced merchandise, and minority groups seeking nondiscriminatory hiring policies that a contrary decision here would have." *Id.* at 324, 88 S.Ct. at 1611-12, 20 L.Ed.2d at 615.

From the foregoing, we think it clear that the holding in *Logan* is not authority for the proposition that the instant defendants' activities at the Mall constituted a protected exercise of first amendment rights.

Having thus concluded that *Logan* is inapposite to the instant appeal, we turn to a consideration of *Wolin* v. *Port of New York Authority, supra.*

In this case, as with *Marsh* and *Logan,* a recitation of the ultimate facts and the specified significance attributed to them by the court in each such case are indispensible to a consideration of its applicability to the judgment from which defendants have appealed.

In *Wolin* v. *Port of New York Authority,* 392 F.2d 88 (2d Cir. 1968), Ronald Wolin and others associated with the Fifth Avenue Vietnam Peace Parade Committee and the Veterans and Reservists to End the War in Vietnam assembled outside an entrance to the bus terminal building operated by the Port of New York Authority at Eighth Avenue and 40th Street, Manhattan. They went there for the purpose of distributing literature to persons on the sidewalk and occasionally engaging in conversation with

persons in the area. These activities, designed to publicize the view of the group concerning the Vietnam war, were at all times conducted in a peaceful and orderly manner.

The Port of New York Authority is a public corporation created in 1921 by agreement between the States of New York and New Jersey. N. Y. *Unconsol. Laws* §§6401, 6404 (McKinney 1961). The bus terminal building operated by the Port Authority occupies a full city block in Manhattan. Thousands of persons use the terminal facilities, entering from the subway or through six outside entrances, using the fifty foot wide main concourse and four other levels to get to and from buses, subways, city streets, shops and other concessions. In 1966 the average number of persons passing through the building each day approximated 205,000 and on December 24, 1966 some 325,000 people used the facility. The terminal contains, in addition to the open concourse areas and waiting rooms, bus line ticket counters, news-stands, restaurants, snack bars, a bakery, a drugstore, a bar, a bowling alley, a bank, gift shops and various other shops and concessions which are open to the general public.

The Port Authority was authorized by law to promulgate rules and regulations regarding use of the terminal facility. One such regulation provided that no person could post, distribute or display signs, advertisements, circulars or printed or written matter within the terminal without permission. In the enforcement of this rule, it was the Port Authority's consistent policy to deny all requests made by individuals or groups seeking access to the terminal for the purpose of distributing leaflets or engaging in other protest activities.

On at least two occasions, Wolin, accompanied by several associates, entered the terminal and distributed leaflets and handbills without seeking permission. Each time they were told by Port Authority security officers to desist.

Wolin then wrote to the Port Authority manager for permission but, consistent with the Port Authority's policy, was refused. Wolin, individually and on behalf of the two aforenamed organizations commenced an action in the United States District Court for the southern district of New York seeking a declaratory judgment. Both parties moved for summary judgment and the District Court judge granted that of the plaintiffs to the extent of holding that the terminal area was dedicated to public use as a thoroughfare and that it was therefore an appropriate place for the exercise of rights protected by the first amendment. He did not, however, grant all the relief sought by the plaintiffs and from the judgment accordingly entered, all parties appealed.

We need not concern ourselves with the plaintiffs' appeal by which they sought to enlarge the scope of the relief granted. What is of significance for our purposes is the affirmance by the United States Court of Appeals for the Second Circuit of the District Court judge's holding that the terminal area, although privately owned, was a proper forum for the dissemination of political expressions.

At the outset, it should be borne in mind that the reference to "private property" as considered by the District Court judge and the Second Circuit on appeal was in recognition of the fact that title to the New York terminal was in a corporation and not the public.[2] Nevertheless, the purposes to be served by the creation of the Authority and the uses to be made by the public of the premises to which it held title are not without significance.

---

[2]"Defendant Port Authority is a public corporation created in 1921 pursuant to a compact between New York and New Jersey. McKinney's Unconsolidated Laws of N. Y. §6401, §6404. Its business is conducted by twelve commissioners, six of whom are appointed by the State of New York and six of whom are appointed by the State of New Jersey. Ibid. §6405. The Port Authority, among other things, operates the Terminal which occupies one full city block between Eight and Ninth Avenues and

Clearly, the main concourse, together with the upper and lower concourses, as well as the several side concourses within the terminal were conceived and designed to be as much a public thoroughfare as the uncovered streets and avenues surrounding the terminal.

Nor can it be doubted that the bus line ticket windows, shops and other concessions located within the terminal exist as accommodations to the public who make use of the terminal in the facilitation of their travel. In other words, such facilitation is the use to which the terminal is dedicated.

Contrariwise, the shops, stores and allied concessions at the Mall constitute the principal use to which the Mall is put and the common walks giving access to such concessions exist for the accommodation of the public invited to shop at the Mall. Thus, though it can be reasonably said that the terminal is a covered extension of the streets and avenues surrounding it, on which thoroughfare first amendment rights are traditionally protected, it is quite another thing to claim that the common sidewalks at the Mall are extensions of the public thoroughfares abutting the Mall. We think that a fair reading of *Wolin* leads to the conclusion that it does not support defendants' position.

This brings us to a consideration of *Diamond* v. *Bland, supra,* which, as previously noted, although vigorously argued to this court was not considered by the trial justice. The reason for this is that the case was not decided by the Supreme Court of California until after the instant appeal was docketed in this court. What was considered by the

---

40th and 41st Streets in Manhattan. The Terminal contains a number of areas open to the public, including a main concourse approximately 50 feet wide, an upstairs and a downstairs concourse, a major subway entrance and various subways and walkways." *Wolin* v. *Port of New York Authority,* 268 F.Supp. 855 at 857 (S.D.N.Y. 1967).

trial justice here was *Diamond* v. *Bland,* 8 Cal.App.3d 58, 87 Cal. Rptr. 97 (1970). This was a decision by the California Court of Appeals for the Fourth District which affirmed a judgment of the California Superior Court enjoining the exercise of first amendment rights in the parking area and common walks of a shopping center known as Inland Center. Parenthetically, Inland Center is also owned by the instant plaintiff.

The trial justice in the case at bar indicated that he was strongly persuaded by the reasoning of the California Court of Appeals. However, the California Supreme Court was not so persuaded and reversed the decision of the Appeal Court for the Fourth District. Rather, like defendants, a majority of the Supreme Court of California was inclined to the belief that the holdings in *Marsh, Logan* and *Wolin,* as well as other cases, have so diluted fifth amendment rights[3] as to deny to the owners of shopping centers, such as the Mall, the right to limit invitations to the public to those uses to which their property is put.

We have attempted at some length to show that *Marsh, Logan* and *Wolin* turn on the facts unique to each of those cases and that the facts of none of them can be realistically equated to those with which we are here concerned. Consequently, although recognizing that there is no significant factual distinction to be made between Inland Center with which the Supreme Court of California was concerned and the Mall in the case before us, we decline to follow the holding of that distinguished tribunal for the reason that we believe such holding to be an unwarranted extension of the principles enunciated in *Marsh, Logan* and *Wolin.*

---

[3]Other cases considered by the Supreme Court of California which are argued by defendants here are: *In re Cox,* 3 Cal.3d 205, 474 P.2d 992 (1970); *In re Hoffman,* 67 Cal.2d 845, 434 P.2d 353 (1967) and *Tanner* v. *Lloyd Corp.,* 446 F.2d 545 (9th Cir. 1971).

From our reading of these cases, however, it would serve no useful purpose to discuss them.

Before concluding, we deem it advisable to note that since defendants' activities were directed toward the 1970 general election, an event long since passed, the controversy is technically moot. However, both parties have urged that because of a continuing public interest and the practical certainty that such interest will result in future litigation looking to a resolution of the identical question, the instant appeal should not be considered as raising what has now become an academic question.

No extended discussion is necessary as to the validity of the grounds on which the parties would have us ignore the mootness issue. Suffice it to say that to dismiss the instant appeal on the technical ground of such mootness as is here present, would ill serve the public's confidence in effective recourse to the courts.

The defendants' appeal is denied and dismissed and the judgment appealed from is affirmed.

Mr. Chief Justice Roberts, concurring. I concur in the conclusion reached by the majority, recognizing that the recent decision of the United States Supreme Court in *Lloyd Corp.* v. *Tanner,* 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972), is controlling here. However, I feel compelled to set forth the reasons I believe the first amendment to the United States Constitution bars the injunctive relief granted to the petitioner in this case.

The petitioner contends that since this shopping complex is privately owned, campaign activities can be conducted there only with the owner's express permission, alleging this activity amounts to a confiscation inasmuch as it interferes with the conduct of business on the premises. In granting the injunction, the trial justice pointed out that "* * * the right of free speech is not absolute and this is particularly so when the right conflicts with another constitutional right." There are indeed narrow limitations upon the exercise of first amendment rights where the public interest or

safety is immediately threatened. However, we must never lose sight of the fact that first amendment freedoms occupy a preferred position. *Marsh* v. *Alabama,* 326 U. S. 501, 509, 66 S.Ct. 276, 280, 90 L.Ed. 265, 270 (1946). The Supreme Court has indicated that prior restraint on expression comes to any court with a heavy presumption against its constitutional validity. *Organization for a Better Austin* v. *Keefe,* 402 U. S. 415, 419, 91 S.Ct. 1575, 1578, 29 L.Ed.2d 1, 5 (1971).

There can be little question that the right of every citizen to freely express his ideas and to seek public office in an effort peacefully to implement those ideas constitutes an essential ingredient of free government. To insure this open exchange of ideas, we have always regarded "* * * public places * * * [as] an important facility for public discussion and political process. They are in brief a public forum that the citizen can commandeer; the generosity and empathy with which such facilities are made available is an index of freedom." Kalven, *The Concept of the Public Forum: Cox* v. *Louisiana,* 1965 Supreme Court Review, 1, 12.

Before its decision in *Marsh* v. *Alabama, supra,* the Supreme Court had established that neither a state nor a municipality could completely prohibit the distribution of literature containing religious or political ideas on its streets, sidewalks, and public places. *Hague* v. *Committee for Industrial Organization,* 307 U. S. 496, 515-16, 59 S.Ct. 954, 964, 83 L.Ed. 1423, 1436-37 (1939). Only those regulations essential to protect the public safety are permitted. *Cox* v. *New Hampshire,* 312 U. S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). Then in a series of decisions beginning with *Marsh* the courts have considered the extent to which first amendment rights may be exercised on property where title is held in private hands but the use is essentially public. In *Marsh* Justice Black opened his consideration of the question by establishing that private ownership does not necessarily con-

stitute absolute dominion. The more an owner opens his property to public use for his own advantage, the more his property rights become circumscribed by the statutory and constitutional rights of those who use it. *Marsh, supra,* at 506, 66 S.Ct. at 278, 90 L.Ed. at 268.

A careful study of those cases cited by the majority makes it clear that the essential inquiry is not whether title to property rests in public or private hands. The answer to that query is simple but inconclusive. Rather, the essential question is the nature of the use to which the owner dedicates his property. Whenever an owner opens his property to the public to a degree whereby the property assumes a public character and the owner reaps great financial benefit from this invitation, he subjects himself at the same time to those minor inconveniences which might result from the presence of political campaigners so long as they do not interfere in any substantial way with the essential business purpose.

Nothing in the record here establishes any significant interference with petitioner's business. Although the trial justice did suggest that permitting such conduct would have "staggering" and "chaotic" results, there is no showing that such would be the result. In fact, the testimony shows and the trial justice acknowledges that other shopping centers in the state allow political campaigning to be conducted on their premises without significant harm.

In *Amalgamated Food Employees Union Local 590* v. *Logan Valley Plaza, Inc.,* 391 U. S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968), the Supreme Court upheld the right of members of the public to picket upon the premises of the shopping center where their activity was directed against the employment practices of a tenant. The Court held that such activity is protected by the first amendment where the manner and purpose are generally consonant with the use to which the property is actually put

but declined to consider whether activity not directly related to the business purpose would be protected.

In the instant case, as in *Marsh* and *Logan Valley*, the property owner, having failed to demonstrate any actual harm to normal business operations, can assert nothing more than "naked title" to property against the preferred place of the first amendment freedoms which have traditionally been exercised in a public forum. Although the majority describes the invitation to the public as a limited one, access is as open and free as that of any public shopping area. There is no justification in tipping the balance in favor of naked title where the owner has created a public forum, reaped great financial benefit to itself through the general invitation which is extended to the public, and has failed to demonstrate any real interference with normal business operations. *Diamond* v. *Bland*, 3 Cal.3d 653, 662-63, 477 P.2d 733, 739, 91 Cal.Rptr. 501, 507 (1970).

As the Second Circuit pointed out in *Wolin* v. *Port of New York Authority*, 392 F.2d 83 (2d Cir. 1968), when a location is clearly open to the public, the inquiry must consider further the character of the place, the pattern of usual activity, the nature of its essential purpose, and the population who takes advantage of the general invitation extended to make it the appropriate place for communication of views on issues of political and social significance. The court went on to point out that these factors to be considered are essentially the same whether the forum selected for expression is a street, park, shopping center, bus terminal, or office plaza.

It might be useful to point out the similarity in the characteristics of the New York terminal and the shopping center involved in the instant case. Each has a wide concourse lined with shops, restaurants, and theaters. Crowds numbering several thousand pass through each facility daily. Both encourage the public to pass through freely.

Both might be described as "* * * something of a small city — but built indoors, with its 'streets' in effect set atop one another * * *." *Wolin, supra,* at 89. In *Wolin* the Second Circuit affirmed the lower court's holding that the terminal area of the Port of New York Authority "* * * was dedicated to public use as a thoroughfare and that it was therefore an appropriate place for the exercise of rights protected by the First Amendment."

It would seem safe to conclude, then, as have courts in other jurisdictions, that wherever walkways are made to be the functional equivalent of public sidewalks and the owner invites the public to use the walkways as they would the public sidewalks and the invitation is extended in an effort to gain financial benefit, the owner cannot then do what a municipality is precluded from doing, namely, prohibit the exercise of first amendment rights. I believe that my conclusion is neither a new nor an unreasonable extension of those cases relied upon by the majority. The California Supreme Court reached a conclusion similar to mine in *Diamond* v. *Bland, supra.* The Court of Appeals of Washington has arrived at a similar result. *Sutherland* v. *Southcenter Shopping Center, Inc.,* 3 Wash.App. 833, 478 P.2d 792 (1970). Finally, in *Lloyd Corp.* v. *Tanner* both the Federal District Court, 308 F. Supp. 128 (D. Ore. 1970) and the Ninth Circuit, 446 F.2d 545 (9th Cir. 1971), reached a conclusion fully consistent with my own, although their decisions have been reversed by the Supreme Court. 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972).

In each of the cases cited the owner of a comparable shopping complex sought to enjoin petitioning activities by citizens upon the center premises. In each instance the appropriate court concluded that the shopping center premises were essentially public and an appropriate forum for the reasonable exercise of first amendment rights. Each of these cases reflects an appreciation that, at least in the

398

suburban setting, the modern shopping center has virtually replaced the public business district described in *Marsh*. The California Supreme Court has indicated that the modern shopping center has undertaken the public function of providing society with the necessities of life. It has become the modern suburban counterpart of the town center. *Diamond* v. *Bland*, *supra*, at 660, 477 P.2d at 737, 91 Cal.Rptr. at 505. In ruling that a shopping center may not arbitrarily deny individuals the right to shop on the premises, the California court pointed out that, at least in the suburban setting, people may have no practicable alternative source of supply for essential commodities. *In re Cox*, 3 Cal.3d 205, 474 P.2d 992, 90 Cal.Rptr. 24 (1970).

While it has been true until now that some shopping centers have allowed campaigning on their premises, today's decision may result in a general prohibition against these activities in the suburban setting. Having determined that the shopping center involved here is essentially public, I can only conclude that it is an appropriate forum for the exercise of first amendment rights.

Both the majority opinion and the decision of the trial justice make reference to the fact that Homart Development Company does not arbitrarily exclude some individuals while allowing others to conduct activities upon the mall premises. While this consideration might be important were the defendants here alleging a denial of due process or equal protection, this general exclusion in no way justifies a limitation upon first amendment rights. The essential fact question is the character of the center as public or private. If the center's walkways are functionally equivalent to a public sidewalk, then first amendment rights can be restricted only if there is a substantial interference with the business purpose. No such finding was made here.

Finally, the question of publicness is considered solely in reference to the public walkways of the mall. I do not mean

to indicate in any way that this concept would permit solicitation on the business premises of the various tenants without their express permission.

*Gunning, LaFazia, Gnys & Selya, Guy J. Wells,* for plaintiff.

*Abedon, Michaelson, Stanzler & Biener, Milton Stanzler,* for defendants.