[L.A. No. 30190. In Bank. Apr. 25, 1974.]

ROGER JON DIAMOND et al., Plaintiffs and Appellants, v.
FRANK BLAND, as Sheriff, etc., et al., Defendants and Respondents.

332

## Counsel

Roger Jon Diamond, in pro. per., for Plaintiffs and Appellants.

A. L. Wirin, Fred Okrand, John D. O'Loughlin, Jill Jakes and Daniel H. Lowenstein as Amici Curiae on behalf of Plaintiffs and Appellants.

Ralph H. Prince, City Attorney, Lawrence M. Cohen, Lederer, Fox & Grove, Allen B. Gresham, Lonergan, Jordan & Gresham, Lonergan, Jordan, Gresham & Varner for Defendants and Respondents.

## Opinion

**BURKE, J.**—In 1970 this court decided the case of *Diamond* v. *Bland,* 3 Cal.3d 653 [91 Cal.Rptr. 501, 477 P.2d 733], in which we held that plaintiff was entitled to solicit signatures on an initiative petition and to distribute leaflets regarding the proposal at defendant's shopping center. Two years later, the United States Supreme Court determined in *Lloyd Corp.* v. *Tanner,* 407 U.S. 551 [33 L.Ed.2d 131, 92 S.Ct. 2219], that the owners of a shopping center in Oregon had the right to prohibit the distribution of political handbills unrelated to the operation of the shopping center. We conclude that *Lloyd* is indistinguishable from the instant case and, accordingly, that we must reappraise our *Diamond* decision in the light of the principles established in *Lloyd.*

Plaintiffs are a nonprofit California corporation, its attorney, and a volunteer worker for the corporation. Prior to our decision in *Diamond,* two representatives of the corporation attempted to solicit signatures on an anti-pollution initiative petition and to distribute leaflets regarding the initiative at Inland Center (hereinafter Center), a shopping center in San

Bernardino owned by defendant Homart.[1] Defendant refused permission, and plaintiff sought injunctive and declaratory relief, alleging that it had a constitutional right to carry out its activities at the Center. The trial court refused to issue an injunction but this court reversed the judgment. Thereafter, the trial court, in response to our decision, issued a permanent injunction restraining defendant from interfering with plaintiff's right to circulate initiative petitions and to engage in other peaceful and orderly First Amendment activities at the Center.

On June 22, 1972, the United States Supreme Court rendered its decision in *Lloyd*. Thereafter, defendant made a motion before the trial court to dissolve the injunction previously issued on the ground that under the holding in *Lloyd* plaintiff had no constitutional right to carry out its activities on defendant's property. The trial court dissolved the injunction, and this appeal followed.[2]

The facts are set forth in our *Diamond* opinion. Briefly, the Center consists of a large parking lot and a covered shopping complex or mall which contains three major department stores and seventy-two single businesses. The mall area is open to the public through unlocked doors, and contains such features as benches and wide, common aisleways. Prospective customers are encouraged to visit the mall and an average of 25,000 persons do so every day, coming from as far away as 75 miles. Inland Center is the largest shopping center in the county.

Defendant prohibited all activity at the Center aside from business promotions and displays, and this policy applied without variance to all types of charitable, religious, social and political groups seeking to use the Center's property for solicitation or discussion. There was no disturbance or disruption of the normal commercial functions of the Center as a result of plaintiff's attempt to collect signatures and distribute leaflets.

Our prior holding in this case was based primarily upon our interpretation of the rationale of two cases of the United States Supreme Court, namely, *Marsh* v. *Alabama,* 326 U.S. 501 [90 L.Ed. 265, 66 S.Ct. 276],

---

[1]The Sheriff and District Attorney of San Bernardino County and the Mayor and Chief of Police of the City of San Bernardino were also joined as defendants. For literary convenience, defendants and plaintiffs will be referred to in the singular.

[2]The trial court advanced several reasons for its action. It concluded that *Lloyd* was controlling, and that plaintiff had available other effective (although perhaps less desirable) sites for the solicitation of signatures, that plaintiff could seek legislative action to ease the process of solicitation, and that defendant nondiscriminatorily prohibited activities of the kind plaintiff sought to exercise at the shopping center.

and *Food Employees* v. *Logan Plaza,* 391 U.S. 308 [20 L.Ed.2d 603, 88 S.Ct. 1601]. In *Marsh,* the court held that a member of a religious organization was constitutionally entitled to distribute religious literature on the streets of a company-owned town. In *Logan* it was decided that a shopping center could not prohibit union picketing of a business located within the center. We also relied on prior California cases applying the principles set forth in *Marsh, Logan,* and other cases of the United States Supreme Court. (See *Schwartz-Torrance Investment Corp.* v. *Bakery & Confectionery Workers' Union,* 61 Cal.2d 766 [40 Cal.Rptr. 233, 394 P.2d 921]; *In re Hoffman,* 67 Cal.2d 845 [64 Cal.Rptr. 97, 434 P.2d 353]; *In re Lane,* 71 Cal.2d 872 [79 Cal.Rptr. 729, 457 P.2d 561].)

In *Lloyd Corp.* v. *Tanner, supra,* 407 U.S. 551, the United States Supreme Court declined to extend the rationale of *Marsh* and *Logan* to require the owner of a shopping center in Oregon to permit the respondents to distribute, on the premises of the shopping center, handbills regarding the draft and the Vietnam war. The court distinguished *Logan* on the basis that, unlike the situation in that case, the handbilling had no relation to any purpose for which the shopping center was being used,[3] and that respondents had adequate alternative avenues to disseminate their views by distributing the material on the public streets and sidewalks, including those surrounding the shopping center. In *Logan,* by contrast, the pickets would have been deprived of all reasonable opportunity to convey their message because the store which was being picketed was located in the center of a large private enclave. *Marsh* was distinguished on the basis that there the owner of the company town was substituting for and performing the customary functions of government; moreover, there existed no public streets on which First Amendment activities could be carried out.

In balancing the interests of the respondents in exercising their First Amendment rights against the property rights of the owners of the shopping center, the court in *Lloyd* concluded that the latter must prevail. The court stated that, in view of the availability to respondents of other public forums for the distribution and dissemination of their ideas, "It would be an unwarranted infringement of property rights to require them to yield to the exercise of First Amendment rights under circumstances

---

[3]By a parity of reasoning, both *Schwartz-Torrance Investment Corp.* v. *Bakery & Confectionery Workers' Union, supra,* 61 Cal.2d 766, and *In re Lane, supra,* 71 Cal.2d 872, are likewise distinguishable, since in both cases labor unions had a labor dispute with, and were picketing, businesses located within the shopping centers. The labor activity in those cases had a direct relation to the businesses affected by that activity, a factor which led us to strike the balance between private property rights and First Amendment activities in favor of the latter.

where adequate alternative avenues of communication exist." (407 U.S. at p. 567 [33 L.Ed.2d at p. 141].)[4]

■    *Lloyd's* rationale is controlling here. In this case, as in *Lloyd,* plaintiffs have alternative, effective channels of communication, for the customers and employees of the center may be solicited on any public sidewalks, parks and streets adjacent to the Center and in the communities in which such persons reside.[5] Unlike the situation in *Marsh* and *Logan,* no reason appears why such alternative means of communication would be ineffective, and plaintiffs concede that, unlike *Logan,* their initiative petition bears no particular relation to the shopping center, its individual stores or patrons. Under these circumstances, we must conclude that defendants' private property interests outweigh plaintiffs' own interests in exercising First Amendment rights in the manner sought herein.

The judgment of the trial court dissolving the injunction previously issued in this case is affirmed.

Wright, C. J., McComb, J, and Clark, J., concurred.

**MOSK, J.**—I dissent.

On December 16, 1970, this court rendered its decision in *Diamond* v. *Bland* (1970) 3 Cal.3d 653 [91 Cal.Rptr. 501, 477 P.2d 733]. The opinion commanded six votes, with one justice filing a three-line cursory dissent. Subsequently the United States Supreme Court on four occasions denied respondents' petitions for certiorari and rehearing (402 U.S. 988

---

[4]Under the holding of the *Lloyd* case, the due process clause of the United States Constitution protects the property interests of the shopping center owner from infringement (407 U.S. at pp. 552-553, 567, 570 [33 L.Ed.2d at pp. 133-134, 141, 143].) That being so, we must reject plaintiffs' proposal, echoed in the dissenting opinion herein, that we consider using the "free speech" provisions of our state Constitution to reach a contrary result in this case. Even were we to hold that the state Constitution in some manner affords broader protection than the First Amendment to the United States Constitution (a question which we expressly leave open), nevertheless supremacy principles would prevent us from employing state constitutional provisions to defeat defendant's federal constitutional rights. (Accord: *Lenrich Associates* v. *Heyda* (Ore.) 504 P.2d 112, 115-116 [plurality opn.].)

[5]Indeed, we pointed out in our original opinion in this case that "Plaintiffs in the instant case cannot claim that effective alternative sites for their First Amendment activities are unavailable. If plaintiffs are barred from circulating their initiative petitions in the Inland Center, they are free to do so on the public streets and sidewalks in the surrounding community." (3 Cal.3d at p. 662; see also *Homart Development Company* v. *Fein* (R.I.) 293 A.2d 493 [owner may bar solicitation of petitions at shopping center].)

[29 L.Ed.2d 153, 91 S.Ct. 1661]; 404 U.S. 874 [30 L.Ed.2d 120, 92 S.Ct. 27]; 405 U.S. 981 [31 L.Ed.2d 257, 92 S.Ct. 1189]; 409 U.S. 897 [34 L.Ed.2d 154, 93 S.Ct. 91]).

Nothing has occurred relevant to the problem since the high court repeatedly refused to intervene in this proceeding other than its rendition of a 5-4 opinion in a case originating in Oregon and bearing superficial similarity to the instant matter (*Lloyd Corp.* v. *Tanner* (1972) 407 U.S. 551 [33 L.Ed.2d 131, 92 S.Ct. 2219].) Leaning on that fragile reed, the majority now abjectly surrender the previous considered position of this court, overlook the unmistakable independent non-federal grounds upon which our earlier opinion could have been based, ignore basic guarantees of our state Constitution, and deal a blow to fundamental principles of federalism as old as our republic.

## I.

Convenient as it may be to reduce diverse federal and state premises to a single body of "constitutional law," there are at least two reasons why this simplistic process is inappropriate. First, it contradicts the hierarchical logic of constitutional doctrine. Second, the provisions and historical bases of the federal and California Constitutions are not the same.

The first point is well analyzed in an article by Professor Hans A. Linde in (1970) 49 Oregon Law Review 125, at page 133: "The federal source of all 'due process' and 'equal protection' attacks on state regulation is the fourteenth amendment's command that 'No State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.' Whether this command has been violated depends on what the state has finally done. Many low-level errors that potentially deny 'due process or equal protection are corrected within the state court system; that is what it is for. The state constitution is part of the state law, and decisions applying it are part of the total state action in a case. When the state court holds that a given state law, regulation, ordinance, or official action is invalid and must be set aside under the state constitution, then the state is not violating the fourteenth amendment. [¶] . . . By the action of the state court under the state constitution, the state has accorded the claimant the due process and equal protection commanded by the fourteenth amendment, not denied it."

Professor Linde continues with this conclusion (at p. 135) which he reports with emphasis: "Judicial review of official action under the state constitution thus is logically prior to review of the effect of the state's total action (including *rejection* of the state constitutional claim) under the

fourteenth amendment. *Claims raised under the state constitution should always be dealt with and disposed of before reaching a fourteenth amendment claim of deprivation of due process or equal protection."*

Our task, then, is to dispose of state constitutional questions before invoking federal doctrine and authority. We must, in that context, "give independent professional attention to the text, history, and function of state constitutional provisions" (Linde, p. 182). Put another way, the "logic of constitutional law demands that nonconstitutional issues be disposed of first, state constitutional issues second, and federal constitutional issues last." (Linde, p. 182.)

Inverting the process, the majority first examine the Fourteenth Amendment, as interpreted by *Lloyd,* find it absolutely controlling and look no further. Much as I disagree with it, I can understand how typical is the majority's dereliction in the arena of state constitutional rights. Unfortunately few state courts steadfastly protect their own state constitutional guarantees; Professor Monrad G. Paulsen found that "Although state constitutions contain full statements of our civil liberties, on the whole the record of state court guardianship of [freedom] is disappointing. Only occasionally do state cases . . . take a position protecting the freedoms beyond what has been required by the United States Supreme Court." (Paulsen, *State Constitutions, State Courts and First Amendment Freedoms* (1951) 4 Vand.L.Rev. 620, 642.) Yet, "State constitutions furnish extensive and sometimes unique materials which can help in the protection of human liberties. . . ." *(Id.* at p. 620.)

The second reason why courts should not recognize a monolithic body of "constitutional law" emerges from consideration of the text and background of the Constitution of the State of California. Without citing chapter and verse, I deem the 27 sections in article I of the California Constitution, comprising our declaration of rights, to be arguably more embracive than the first 10 amendments, plus the Fourteenth, of the United States Constitution. Particularly relevant here are the guarantees provided in section 9 for every citizen to "freely speak, write, and publish his sentiments on all subjects . . . and no law shall be passed to restrain or abridge the liberty of speech or of the press," and in section 10 assuring the right of the people "to petition the Legislature [or the people acting in the legislative process] for redress of grievances," and in section 21 providing that no citizen or class of citizens shall "be granted privileges or immunities which, upon the same terms, shall not be granted to all citizens."

At the time the original California Constitution was adopted in 1849, the law was clear that the federal Bill of Rights was inapplicable to the

states. *Barron* v. *Baltimore* (1833) 32 U.S. (7 Pet.) [8 L.Ed. 672] was the prevailing authority. In that legal milieu our basic document was drafted by a constitutional convention that was a reflection of the youth, heterogeneity and independence of the state at that time. Paul Mason in Constitutional History of California (1951) page 83, notes that of the 137 sections of the original Constitution 66 were adapted from the Constitution of Iowa and 19 from the Constitution of New York. The remaining sections were copied from other state documents; reference by the framers of our basic document to the United States Constitution was at most fleeting and casual.

Indeed Judge William J. Palmer and Paul P. Selvin in their article, *The Development of Law in California,* West's California Codes Annotated, Constitution, volume 1, page 14, observed that "many of the problems with which the 1849 Convention concerned itself were necessarily quite dissimilar from those which had given the drafters of the Federal Constitution the most difficulty. Such differences were not illogical or anomalous. The broad, guiding principles and methods of a federation were an objective quite different from the exigent details of a sovereign state government." While a more prolix Constitution was adopted in 1879, and the state bill of rights "has been elaborated somewhat through the years, but today California's Bill of Rights still rests on the bedrock 'Declaration of Rights' of the 1849 Constitution." (Palmer and Selvin, p. 16.)

In short, the guarantees of individual liberties contained in the California Constitution were not founded upon, are not dependent upon, and have a status independent of, the Constitution of the United States.

## II.

Every decision by the United States Supreme Court dealing with the subject has held that the states remain free to adopt higher standards for protection of individual rights than compelled by the federal Constitution (*Johnson* v. *New Jersey* (1966) 384 U.S. 719, 733 [16 L.Ed.2d 882, 892, 86 S.Ct. 1772]). This court so recognized in *Kaplan* v. *Superior Court* (1971) 6 Cal.3d 150, 155 [98 Cal.Rptr. 649, 491 P.2d 1], citing *Cooper* v. *California* (1967) 386 U.S. 58 [17 L.Ed.2d 730, 87 S.Ct. 788], and *Alderman* v. *United States* (1969) 394 U.S. 165 [22 L.Ed.2d 176, 89 S.Ct. 961].

In *Cooper* Justice Black wrote: "Our holding, of course, does not affect the State's power to impose higher standards [on constitutional issues] than required by the Federal Constitution if it chooses to do so." (386 U.S. at p. 62 [17 L.Ed.2d at p. 734].) And in *Alderman* Justice White in analyzing

the exclusionary rule made it clear that the states may extend the rule beyond what is required by the federal Constitution. (394 U.S. at p. 175 [22 L.Ed.2d at p. 188].)

In *Johnson* v. *Louisiana* (1972) 406 U.S. 356 [32 L.Ed.2d 152, 92 S.Ct. 1620], and *Apodaca* v. *Oregon* (1972) 406 U.S. 404 [32 L.Ed.2d 184, 92 S.Ct. 1628], Justice Powell discussed the merits of federalism and the necessity for diversity among the 50 states with regard to constitutional interpretation. Requirements cannot be uniform, he indicated, noting that "it strains credulity to believe that [constitutional amendments] were intended to deprive the States of all freedom to experiment with variations." (406 U.S. at p. 376 [32 L.Ed.2d at p. 167].)

It is comforting to reflect upon *Elkins* v. *United States* (1960) 364 U.S. 206, 220 [4 L.Ed.2d 1669, 1679, 80 S.Ct. 1437], and *Mapp* v. *Ohio* (1961) 367 U.S. 643, 651-652 [6 L.Ed.2d 1081, 1087-1088, 81 S.Ct. 1684, 84 A.L.R.2d 933], cases in which the United States Supreme Court commended California for going beyond the personal liberty guarantees then required by the federal Constitution in adopting the exclusionary rule to assure obedience to constitutional rights. Reference was to *People* v. *Cahan* (1955) 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513].

*Cahan* is not the only example of the independence, and occasional prescience, of this court where individual rights are involved. In some instances we have relied upon the California Constitution exclusively, as in *People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880], *In re Lynch* (1972) 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921], *In re Lopez* (1970) 2 Cal.3d 141 [84 Cal.Rptr. 361, 465 P.2d 257], *In re Smiley* (1967) 66 Cal.2d 606 [58 Cal.Rptr. 579, 427 P.2d 179], *People* v. *Clark* (1965) 62 Cal.2d 870, 882 [44 Cal.Rptr. 784, 402 P.2d 856], and *People* v. *Henderson* (1963) 60 Cal.2d 482, 495 [35 Cal.Rptr. 77, 386 P.2d 677]. In other cases we have employed both the federal and state Constitutions, as in *Serrano* v. *Priest* (1971) 5 Cal.3d 584 [96 Cal. Rptr. 601, 487 P.2d 1241], *Raffaelli* v. *Committee of Bar Examiners* (1972) 7 Cal.3d 288 [101 Cal.Rptr. 896, 496 P.2d 1264, 53 A.L.R.3d 1149], and *Curry* v. *Superior Court* (1970) 2 Cal.3d 707 [87 Cal.Rptr. 361, 470 P.2d 345]. In still other matters, where the basis was in doubt, upon remand from the United States Supreme Court we have made it clear that an independent state ground was available, as in *Dept. of Mental Hygiene* v. *Kirchner* (1965) 62 Cal.2d 586 [43 Cal.Rptr. 329, 400 P.2d 321, 20 A.L.R.3d 361], *People* v. *Krivda* (1973) 8 Cal.3d 623 [105 Cal. Rptr. 521, 504 P.2d 457] and *Rios* v. *Cozens* (1973) 9 Cal.3d 454 [107 Cal.Rptr. 784, 509 P.2d 696]. Note numerous other decisions of this court

collected in Falk, *The State Constitution: A More Than "Adequate" Non-federal Ground* (1973) 61 Cal.L.Rev. 273 ff.

The foregoing illustrative cases demonstrate the viability of two separate and distinct judicial systems as anticipated by the doctrine of federalism upon which our republic is based. In *Atlantic C. L. R. Co.* v. *Engineers* (1970) 398 U.S. 281, 285 [26 L.Ed.2d 234, 240, 90 S.Ct. 1734], the United States Supreme Court recognized the inherent power in the states to create and maintain "state judicial systems for the decision of legal controversies." (398 U.S. at p. 285 [26 L.Ed.2d at p. 240].) Each system is to proceed independently of the other with ultimate review in the United States Supreme Court only of federal questions. Obviously, said the high court, this dual system could not function if state and federal courts were "free to fight each other for control of a particular case. Thus, in order to make the dual system work . . . it was necessary to work out lines of demarcation between the two systems." (398 U.S. at p. 286 [26 L.Ed.2d at pp. 240-241].)

Unfortunately by abjectly surrendering the right of this *state* court to decide on *state* constitutional grounds the basic issue of freedom to petition the *state* government for redress of grievances through *state* elective procedures, the majority blur the lines of demarcation between two separate and distinct judicial systems. Their abdication of the previous decision of this court is a serious blow to state sovereignty and to the independence which has previously been the hallmark of this court.

### III.

The majority opinion determines merely that by virtue of *Lloyd* the United States Constitution does not compel a result in plaintiff's favor. This conclusion, even if arguably sound, confronts only part of the problem. The majority blithely ignore the effect of our own Constitution and statutes upon the rights of plaintiff.

In my view, plaintiff's right to solicit signatures and distribute literature in connection therewith on the terrain of the Inland Center is protected under section 9 of article I of the California Constitution.[1] Although we

---

[1]Article I, section 9, of the California Constitution provides in part, "Every citizen may freely speak, write, and publish his sentiments on all subjects . . . and no law shall be passed to restrain or abridge the liberty of free speech or of the press."

Defendants contend that *Lloyd* precludes us from applying California law to vindicate plaintiff's right to carry out its activities at Inland Center. They interpret *Lloyd* as standing for the proposition that the property rights of the owner of the shopping center would be violated contrary to the Fifth and Fourteenth Amendments to the United States Constitution if he were compelled to allow persons in

did not dwell upon that section in our original *Diamond* opinion, we did rely primarily on state authority (e.g., *Schwartz-Torrance, Lane, Hoffman, Cox,* discussed *infra*), and the rationale employed is consistent with the foregoing interpretation of the provisions of our own Constitution. Our holding in *Diamond* was based upon a determination that the interest of plaintiff in the exercise of its right of free speech must prevail when balanced against the interest of defendant in the exclusive possession and enjoyment of its private property.

The rationale we employed merits explication. For a number of years cases in this state even prior to the federal decision in *Food Employees* v. *Logan Plaza* (1968) 391 U.S. 308 [20 L.Ed.2d 603, 88 S.Ct. 1601], have held that union members enjoy the right to picket an employer on the property of a privately owned shopping center. These decisions emphasized that an employee who sought to bring his grievance to the attention of the public and apply economic sanctions against his employer could effectively do so only at the place where the business was located, and that any incidental impairment of the shopping center owner's property rights was largely theoretical since he had opened his premises to the public and his right in the property was "worn thin by public usage." (*Schwartz-Torrance Investment Corp.* v. *Bakery & Confectionery Workers' Union* (1964) 61 Cal.2d 766, 774-775 [40 Cal.Rptr. 233, 394 P.2d 921]; *In re Lane* (1969) 71 Cal.2d 872, 878 [79 Cal.Rptr. 729, 457 P.2d 561].) The theory of these cases was extended by *In re Hoffman* (1967) 67 Cal.2d 845 [64 Cal.Rptr. 97, 434 P.2d 353], to nonpicketing situations. In *Hoffman,* an opinion written by Chief Justice Traynor, we held that the bare title of the owners of a privately owned railway station was not a sufficient interest to outweigh the interests of persons who attempted to distribute antiwar leaflets at the station.

The *Diamond* opinion recognized that although *Schwartz-Torrance* and *Lane* were factually distinguishable in some respects, the distinction did not justify striking a new balance to limit plaintiff's freedom of expression.

plaintiff's position to exercise their constitutional rights on his private property. *Lloyd* should not be read as placing such a broad and sweeping restriction upon a state's implementation of its own laws and policies. Although the *Lloyd* opinion mentions the property rights of the shopping center owner (e.g., 407 U.S. at pp. 552-553, 567 [33 L.Ed.2d at pp. 133-134, 141]), the overall thrust of the opinion imposes a restriction on the First Amendment rights of the handbill distributor only under the circumstances there involved and the opinion recognizes that the size and diversity of activities of a shopping center might warrant a different result in another context. Defendant cites *Lenrich Associates* v. *Heyda* (Ore. 1972) 504 P.2d 112, in support of its argument, but a close examination of *Lenrich* discloses that there was no majority for the viewpoint advocated by defendant.

We conceded in *Diamond* that in the picketing situation the only effective place for communication of the employee's message was at the place of his employer's business whereas in the instant case there were alternative sites to solicit signatures, such as the public streets and sidewalks. In spite of this possibility, we emphasized that plaintiff had a substantial interest in being able to solicit signatures and distribute information at the Center since thousands of persons congregate on foot there daily, the Center serves as the primary business district for a large surrounding community, and it is the most effective and desirable location for plaintiff's solicitation. (3 Cal.3d at p. 662.) In other words, we determined that despite the availability of alternative sites, the balance was still in plaintiff's favor.

An important factor relied upon in *Diamond* was the role of the shopping center in the life of the community. Just as the company town has become an anachronism in modern society, as the opinion in *Lloyd* points out at page 561 [33 L.Ed.2d at page 138], so has the traditional downtown business district become outmoded in many areas as a place for residents to gather in substantial numbers. We said in *In re Cox* (1970) 3 Cal.3d 205 [90 Cal.Rptr. 24, 474 P.2d 992], that the shopping center has undertaken the public function of providing society with the necessities of life and has become the modern suburban counterpart of the town center. (Fn. 11, at p. 216.)

The importance assumed by the shopping center as a place for large groups of citizens to congregate is revealed by statistics: in 21 of the largest metropolitan areas of the country shopping centers account for 50 percent of the retail trade; in some communities the figure is even higher, such as St. Louis (67 percent) and Boston (70 percent). (Note (1973) Wis. L.Rev.612, 618 and fn. 51.) Increasingly, such centers are becoming "miniature downtowns"; some contain major department stores, hotels, apartment houses, office buildings, theatres and churches. (Business Week, Sept. 4, 1971, pp. 34-38; Chain Store Age, Sept. 1971, p. 4.) It has been predicted that there will be 25,000 shopping centers in the United States by 1985. (Publishers Weekly, Feb. 1, 1971, pp. 54-55.) Their significance to shoppers who by choice or necessity avoid travel to the central city is certain to become accentuated in this period of gasoline and energy shortage.

In view of the prominence of the shopping center as a gathering place for large numbers of people, the tenuous nature of defendant's property right in the center with regard to the entry of the public on the premises, and the fact that plaintiff is seeking to exercise at the center a right which is at the fountainhead of all of our liberties, it is my view, consistent with the cases cited above, that under article I, section 9, of the California

Constitution, defendant may not prohibit plaintiff's activities on its premises.

## IV.

There is in the instant case an element, not present in any of the authorities cited above, which provides additional support for vindication of plaintiff's rights. Plaintiff sought to collect signatures on an initiative petition and to distribute literature relating to the initiative. Under our Constitution, the power of initiative is reserved to the people (art. IV, § 1), and courts are zealous to preserve its unfettered exercise "to the fullest tenable measure of spirit as well as letter." (*McFadden* v. *Jordan* (1948) 32 Cal.2d 330, 332 [196 P.2d 787].) In order to implement this vital policy, we have recognized that it is desirable for initiative measures to reach the ballot without delay or excessive expenditures of time, money and effort. (*Gage* v. *Jordan* (1944) 23 Cal.2d 794, 799 [147 P.2d 387].)

Article IV, section 22, of the California Constitution specifies that an initiative petition must be signed by electors equal in number to 5 percent (for a statute) and 8 percent (for a constitutional amendment) of the votes cast for all candidates for Governor at the last election. At the time plaintiff sought to qualify the anti-pollution initiative, more than 500,000 signatures were required; normal attrition dictates that a considerable number in excess of that figure be obtained to assure that the petitions contain 500,000 valid signatures. The Legislature has specified in the Elections Code that proponents of an initiative measure must obtain the requisite number of signatures within a maximum of 150 days from the date the Attorney General delivers the summary of the chief purpose of the measure. (Elec. Code, §§ 3507, 3520.)

It seems evident that in order to secure such a large number of signatures in 150 days—nearly 3,500 every day—the proponents of a measure must have access to places at which a substantial number of persons congregate on a regular basis. This is particularly true in the case of poorly financed measures which must rely upon volunteers rather than upon an army of paid professional canvassers, door-to-door solicitors, and advertising through the media as a means of informing the public of the proponent's views prior to actual solicitation. In order to avoid the possibility that the initiative process will become the captive of well-financed special interest groups, and in view of the long-standing and emphatic expressions of state policy in favor of the full and free exercise of the right of initiative, plaintiff should be accorded the right to solicit signatures on initiative petitions and distribute literature with regard to such measures at the Inland Center.

This conclusion is bolstered by *Schwartz-Torrance Investment Corp.* v. *Bakery & Confectionery Workers' Union, supra,* 61 Cal.2d 766. We held in that case that the owner of a shopping center may not enjoin as a trespass a union's peaceful picketing of premises leased by an employer from the owner of the center. We justified our determination on the basis of the public policy in favor of concerted collective bargaining activities, as expressed in various statutes and decisions of the courts of this state. The present case is even more compelling than *Schwartz-Torrance,* since it seeks to vindicate a noneconomic right rooted in the Constitution—a right which is an integral part of the constitutionally created legislative process.

## V.

Contrary to the ill-considered premise of the majority opinion, *Lloyd* is distinguishable from the present case. *Lloyd* involved the distribution of leaflets, while here plaintiff sought to obtain signatures on an initiative petition. A primary factor in the *Lloyd* rationale was that the respondents there had adequate alternative avenues of communication, so that it was unnecessary to diminish the property rights of the owners of the shopping center. The high court opinion points out that respondents could have distributed their handbills on public streets or sidewalks, notably the streets surrounding the shopping center, as well as at the entrance to the center's parking lot, where cars were required to come to a complete stop.

Such alternatives are far less effective where, as here, solicitors seek to obtain signatures on a petition. Customers ordinarily arrive at a shopping center by automobile, and while it might be feasible as suggested in *Lloyd* merely to offer them a handbill while their cars are stopped at the entrance to the parking lot, it would be impossible to detain vehicle operators at the entrance to the parking lot long enough to obtain a large number of signatures.

Another significant difference between the distributor of a handbill and the solicitor of signatures on an initiative petition lies in the result flowing from interference. If the handbill distributor's activities are hampered, the consequence is only that his potential circulation is reduced; in the case of an initiative petition, either the requisite number of signatures to qualify the measure for the ballot is obtained within a stated period of time, or the entire initiative drive is a failure. These distinctions in the need for access to shopping centers distinguish the present situation from that involved in *Lloyd.* Indeed, we specifically recognized in *Diamond* that the shopping center is a highly significant vehicle for the dissemination of ideas where

the activity requires time for discussion and a place to obtain signatures. (3 Cal.3d at p. 660.)[2]

Obviously, no precise assessment is possible as to the indispensability of the role of the shopping center in the present context, and it cannot be said with certainty that an initiative measure will fail to qualify for the ballot unless it has access to shopping center throngs. In my view, however, plaintiff has made an adequate showing that if solicitation of signatures at the Inland Center is prohibited a vital aspect of the election process would be seriously inhibited.

It bears repeated emphasis that we do not have under consideration the property or privacy rights of an individual homeowner or the proprietor of a modest retail establishment. As a result of advertising and the lure of a congenial environment, 25,000 persons are induced to congregate daily to take advantage of the numerous amenities offered by the Inland Center. A handful of additional orderly persons soliciting signatures and distributing handbills in connection therewith, under reasonable regulations adopted by defendant to assure that these activities do not interfere with normal business operations (see *Diamond* at p. 665) would not markedly dilute defendant's property rights. On the other hand, to deny plaintiff access to the Inland Center would appreciably diminish its ability to qualify an initiative measure for the state ballot.

With remarkable candor the majority reveal what this case is all about: "defendant's private property interests outweigh plaintiffs' own interests in exercising First Amendment rights" (*ante,* p. 335). That naked conclusion is but a recitation of a long discredited shibboleth of nineteenth century legal and political thought. It is conspicuously misplaced in a contemporary opinion of this court.

I would prefer to heed Justice Jackson's warning in his concurring opinion in *Edwards* v. *California* (1941) 314 U.S. 160, 185 [86 L.Ed. 119, 131, 62 S.Ct. 164]: "Property can have no more dangerous, even if unwitting, enemy than one who would make its possession a pretext for unequal or exclusive civil rights." Private ownership must be respected, but its enforceable rights that diminish the fundamental rights of others should be tempered by what Justice Holmes once described as "the equilibrium of social desires."

---

[2]Although we stated in *Diamond* that "effective" alternative sites were available to plaintiff, we also recognized that access to the shopping center was the most effective and desirable location for plaintiff's activities.

I would reverse the trial court's order and direct the trial court to reinstate the injunction heretofore issued.

Tobriner, J., concurred.

**SULLIVAN, J.**—I join in Parts III, IV and V of Justice Mosk's dissenting opinion. I would, therefore, reverse the order dissolving the injunction and remand the cause to the trial court with directions to reinstate the injunction heretofore issued.

Appellants' petition for a rehearing was denied May 29, 1974. Tobriner, J., Mosk, J., and Sullivan, J., were of the opinion that the petition should be granted.