[Civ. No. 43979. Second Dist., Div. One. July 24, 1975.]

NATIONAL MOVEMENT FOR THE STUDENT VOTE et al.,
Plaintiffs and Appellants, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,
Defendants and Respondents.

COUNSEL

Hecht, Diamond & Freis, Hecht & Diamond and Roger Jon Diamond for Plaintiffs and Appellants.

Donald L. Reidhaar, Milton H. Gordon and Gary Morrison for Defendants and Respondents.

OPINION

WOOD, P. J.—Plaintiffs Chuck Levin and the National Movement For The Student Vote filed a complaint for an injunction restraining defendants The Regents of The University of California and the Chancellor of The University of California at Los Angeles from ordering plaintiffs or their representatives to leave the premises of the dormitories and from interfering with efforts of the plaintiffs to register voters in dormitories of the university. The matter was submitted on stipulated facts and other evidence. The court concluded that California law requires that registrars be permitted to register voters at reasonable times and in reasonable places, that the grant of permission by defendants to registrars to conduct vote registration at tables and stands in the lobbies of the dormitories was reasonable, and that defendants were not required to permit registrars to canvass students in their rooms above the first floor of the dormitories. Plaintiffs appeal from the judgment in favor of defendants.

The parties entered into a written stipulation entitled, "Partial Stipulation of Facts Upon Which Case Is To Be Tried"; and they reserved the right to produce additional testimony and other evidence. The plaintiffs called Levin as a witness, and the defendants called Mr. Travis (assistant director of Reiber Hall, one of the dormitories involved herein) as a witness. Also, the judge suggested (at trial) that it might be necessary for him to view one of the dormitories. To that suggestion, counsel for plaintiff said, "No objection"; and counsel for defendants said that the court could use as evidence anything the court saw there. Counsel also provided the name of an official at the university with whom the court might make arrangements for the visit; and counsel for

plaintiffs suggested that the court visit the university before the semester was over. Pursuant thereto, the court viewed the premises.

The stipulation of facts and the findings (based on the stipulation and other evidence) are in substance the same. It does not appear that there is any dispute as to the facts.

Plaintiff Levin is the Southern California director of plaintiff National Movement For The Student Vote, and at all times mentioned herein, he was a deputy registrar of voters in the county. Defendant Regents of The University of California is a public corporation which, pursuant to article IX, section 1, of the Constitution, is vested with full powers of organization and government of the public trust known as the University of California (University hereinafter). Defendant Young is Chancellor of the University of California at Los Angeles (U.C.L.A. hereinafter).

At U.C.L.A., defendant Regents operates dormitories known as Dykstra Hall, Hedrick Hall, Reiber Hall, and Sproul Hall. Each dormitory contains rooms for approximately 800 students, who live therein pursuant to a standard "Residence Hall Contract." The "general layout" of Hedrick, Reiber, and Sproul halls is as follows: On the first floor there are a lobby, "front desk," dining facilities, lounges, recreation rooms, television viewing rooms, study libraries, staff offices, and public restrooms. The upper floors have rooms for students—one wing thereof is occupied by male students, and another wing thereof is occupied by female students. There are 35 to 42 rooms on each of the upper floors. None of the student rooms has a kitchen or washing or toilet facilities. Each of the upper floors has two combination shower and toilet rooms. A student who desires to use the showers or toilets must walk from his or her room by common hallways to the shower and toilet room. The general layout of Sproul Hall is similar to that of the other halls, except it does not have wings—the top four of the upper floors thereof are occupied by female students, and the bottom six of the upper floors are occupied by male students. Persons who are not residents of the dormitories or who are not employees of the University are not allowed to be on the floors (upper) that contain student rooms except when specifically invited as a guest by a resident student; and the hallways leading to the student rooms are not open to the public.

It is the policy of the University to "recognize and enhance the privacy" of residents of the dormitories and to exclude unauthorized

persons from the floors of student rooms in order to minimize assaults on students and thefts of their property. In furtherance of such policy, the University adopted the "UCLA Residence Hall Regulations 1972-73" and the "Policy on Distribution of Materials, Solicitation of Signatures, and Recruitment in University Residence Halls"; and the provisions thereof were in effect herein. Under said policy, solicitation and distribution of materials and recruitment of students can be conducted within the dormitories only with prior approval of the associate dean of housing services of the University. During the past four years, no such permission has been granted except on an occasion when Uni-Camp, which is a program sponsored by the University for underprivileged children, was granted such permission. Occasionally, salesmen and "other outsiders" enter the dormitories without permission and attempt to solicit students "on a door-to-door basis." When such activity is discovered, the person making such solicitation is asked to leave the dormitory, and, if necessary, the U.C.L.A. police are called to remove him from the dormitory.

It is the policy of the University to allow deputy registrars of voters to conduct voter registration at stands or tables in the main lobby of each dormitory. (The University also permits such deputies to maintain stands at various public places on the campus.) Student residents of each dormitory pass through the main lobby of the dormitory when they go out of the dormitory from their rooms or when they go from their rooms to the facilities on the main floor, such as the dining facilities.

Registration for the general election held on November 7, 1972, closed on October 8, 1972. In late September and early October 1972, plaintiff Levin "and others" conducted voter registration activities within the dormitories as hereinafter set forth. On September 26, 1972, about 8:30 p.m. several student residents of Reiber Hall telephoned Mr. Clark, who is assistant dean in residence of that hall, and complained to Mr. Clark about the activities of persons who were coming to their rooms in the dormitory and engaging them in discussions regarding the upcoming election. In response to said telephone calls, the dean asked the persons who were conducting those activities to leave Reiber Hall because the University policy did not allow soliciting or canvassing of students in their rooms.

In the evening of October 1, 1972, the dean received more telephone calls from student residents of Reiber Hall wherein the students

complained that persons were coming into their rooms on the sixth floor of the women's wing of the dormitory and "canvassing" students and "seeking registrations" for the upcoming election. The dean went to the dormitory and told the canvassers and deputy registrars, including plaintiff Levin, to leave the premises. They refused to leave; and the dean called the U.C.L.A. police department. An officer thereof came to the dormitory and escorted them from the dormitory.

One of the persons who had been engaged in canvassing and registering students at Reiber Hall was Leslie Burkes. On September 25, and 26, 1972, and on October 2, 1972, the dean invited Miss Burkes to set up a table in the main lobby of Reiber Hall for registration of voters. On October 3, 1972, about 4:30 p.m., Miss Burkes and another person set up a table in the main lobby of said dormitory for registration of voters and stayed there for approximately an hour and a half. During that time, the dean saw students register to vote at the table.

On October 3, 1972, Levin and the National Movement (of which movement Levin is the Southern California director) filed the herein complaint for injunctive relief; and a temporary restraining order was issued restraining the Regents and the Chancellor from ordering plaintiffs or their representatives to leave the premises of the dormitories and from interfering with their efforts to register student voters at the dormitories.

Following issuance of a temporary restraining order, Levin and other persons met with officials of the University to agree upon procedures for conducting door-to-door voter registration in the dormitories while the temporary restraining order was in effect. Thereafter, door-to-door registration was conducted prior to the close of registration on October 8, 1972. At the hearing of the preliminary injunction on October 13, 1972, plaintiffs withdrew their application for a preliminary injunction for the stated reason that registration for the general election of November 7, 1972, had closed on October 8, 1972. During such period after issuance of the temporary restraining order until the close of registration, a few deputy registrars canvassed students in the dormitory, and "only male registrars canvassed men's floors" and "only female deputy registrars canvassed women's floors." Such voter registration activities after issuance of the temporary restraining order "by a few registrars

canvassing rooms on an individual basis did not disrupt dormitory activities."

The facts hereinabove set forth were, as previously stated, the substance of the stipulated facts and the findings. Also, Levin testified that before he was stopped by university officials, he registered voters door-to-door in the upstairs portion of Reiber Hall for one or two hours a day on two days; he does not recall how many voters he registered on those days; he registered about six voters on one of the days; he also "manned" tables on the main floor for a couple of hours a few days each week; and at the table about four voters an hour were registered; there were signs at the tables; each sign was about 15 inches by 14 inches and stated: "Voters Register Here"; and the signs stated that as a result of a recent court ruling[1] students had a right to register at their campus address. It was also stipulated that the court could read and consider a declaration by Levin filed in opposition to defendant's motion for summary judgment. In that declaration Levin stated, among other things, that when he and other persons went door-to-door in the dormitories to register voters, they were able to register more voters than they were able to register at tables in the lobbies of the dormitories and throughout the campus.

Mr. Clark testified that students must go through the main lobby in order to get to and from their rooms; and signs were displayed "all over" the dormitory advising students that they were eligible to vote if they were 18 years of age and a resident of the county and precinct for 30 days. (He also gave testimony which in substance was the same as the stipulation regarding certain facts, such as complaints received from students as to registration activities in their rooms.)

Conclusions of law were as follows:

"1. The laws of the State of California do not require that registrars be permitted to register voters in every portion of every structure in the State of California, but rather said laws require only that registrars be permitted to register voters at reasonable times and in reasonable places.

"2. The grant of permission by defendants to registrars to conduct voter registration at tables and stands in the main lobbies of the

---

[1]Apparently *Jolicoeur* v. *Mihaly*, 5 Cal.3d 565 [96 Cal.Rptr. 697, 488 P.2d 1].

dormitories at the Los Angeles Campus of the University of California is reasonable and in compliance with the laws of the State of California and permits voter registration of students residing in the dormitories at their place of residence.

"3. Defendants were not required by the laws of the State of California to permit registrars to register voters on an individual room-canvassing basis or in any other manner above the first floor level of the dormitories at the Los Angeles Campus of the University of California."

Appellants contend that door-to-door voter registration in university dormitories is protected by the federal and state Constitutions and by statutory law in California.

Respondent contends that the trial court properly interpreted applicable statutes and that plaintiffs have no constitutional right to invade the private living quarters of the dormitory to canvass or register voters.

In 1972, section 201 of the Election Code provided in part[2] that it is the intent of the Legislature that county clerks, in order to promote and encourage voter registrations, shall deputize as registrars qualified citizens in such a way as to cover most effectively every section of the county, and that the persons so deputized shall be permitted to register voters anywhere within the county, and the county clerk shall not deny deputy registrars the right to register voters anywhere in the county. In 1972 (and presently) section 204.5 of said code provided that any person deputized by the county clerk "to register voters may secure registrations at the places of residence of the persons to be registered."

■ Statutes must be given a reasonable interpretation that will carry out the intent of the Legislature and hold them valid and operative. (*Rose* v. *State of California,* 19 Cal.2d 713, 723 [123 P.2d 505]; see *Ivens* v. *Simon,* 212 Cal.App.2d 177, 181 [27 Cal.Rptr. 801].) If the terms of a statute are by fair and reasonable interpretation capable of a meaning consistent with the requirements of the Constitution, the statute will be given that meaning, rather than another meaning in conflict with the Constitution. (*Braxton* v. *Municipal Court,* 10 Cal.3d 138, 145 [109 Cal.Rptr. 897, 514 P.2d 697].)

---

[2]The 1973 amendment to said section did not change the provisions of said section hereinabove set forth.

■ In the above statutes (Elec. Code, §§ 201, 204.5), the Legislature has provided that deputy registrars may register voters anywhere in the county "at the places of residence" of the persons to be registered.[3] If such statutes were interpreted to permit deputy registrars to enter in a private residence at any time day or night without consent of the person residing there such an interpretation would be inconsistent with the Constitution.[4] The trial court herein properly concluded that statutory law does not require that deputy registrars be permitted to register voters in every portion of every structure, but requires only that they be permitted to register voters at reasonable times and in reasonable places.

■ As above stated, the trial court concluded that the grant of permission by defendants for deputy registrars to conduct voter registration at tables and stands in the main lobbies of the dormitories was reasonable and in compliance with law; and that defendants were not required by the law to permit the deputies to register voters on an individual room-canvassing basis above the first floor of the dormitories. Those conclusions are supported by the evidence. As above shown, there was evidence and findings to the effect that dining and other facilities of the dormitories are on the main floor; the private rooms of the students are on the upper floors; the rooms do not contain kitchen, washing, or toilet facilities; each student must walk from his or her room to restroom facilities in the halls of the upper floors in order to bathe or use the toilet facilities; defendants, in order to "recognize and enhance the privacy" of

[3]In *McMillan* v. *Siemon,* 36 Cal.App.2d 721, 729 [98 P.2d 790], it was said, with reference to enactment of provisions requiring voters to register as a condition of exercising the privilege of voting: " 'Such provisions do not add to the qualifications required of electors, nor abridge the right of voting, but are only reasonable regulations for the purpose of ascertaining who are qualified electors, and to prevent persons who are not such electors from voting.' "

[4]In *City of Carmel-By-The-Sea* v. *Young,* 2 Cal.3d 259, 267 [85 Cal.Rptr. 1, 466 P.2d 225, 37 A.L.R.3d 1313], wherein it was held that a statute requiring public officers and candidates to file a financial statement was an overbroad intrusion into the right of privacy, it was said (in referring to *Griswold* v. *Connecticut,* 381 U.S. 479 [14 L.Ed.2d 510, 85 S.Ct. 1678], and other cases): "Differing aspects of the protection of privacy from intrusion by government are variously found to lie in the penumbra of the First Amendment, in the restrictions of the due process clause of the Fourteenth Amendment, or in the Ninth Amendment retained rights; other zones of privacy are affirmed in the Fourth Amendment 'right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures,' and in the self-incrimination clause of the Fifth Amendment. . . . As *Griswold* notes, 'The Fourth and Fifth Amendments were described in *Boyd* v. *United States,* 116 U.S. 616, 630 [29 L.Ed. 746, 751, 6 S.Ct. 524], as protection against all governmental invasions "of the sanctity of a man's home and the privacies of life." ' "

the students and to minimize assaults upon them and thefts of their property, have maintained a policy and regulations prohibiting solicitation, distribution of materials, and recruitment of students in the upper-floor rooms; students in the upper rooms complained to university officials about persons coming to their rooms and canvassing them and seeking their registrations; defendants permitted signs regarding the election to be posted throughout the dormitories and permitted deputy registrars to maintain tables and stands in the main lobby of each dormitory for registration of students; students in each dormitory had to pass through the main lobby thereof in order to go to and from their rooms; a sign encouraging registration to vote was at each table; and students registered to vote at the tables.

Appellants argue that the decision in *Braxton* v. *Municipal Court, supra* (10 Cal.3d 138), requires reversal of the judgment herein. They also argue that the herein case is "almost identical" to *James* v. *Nelson,* 349 F.Supp. 1061.

In the *Braxton* case, the Supreme Court (pp. 142-143) considered constitutionality and proper construction of section 626.4 of the Penal Code, which authorizes the chief administrative officer of a university to issue an order summarily barring any person from a campus upon reasonable cause to believe that such person has wilfully disrupted the orderly operation of the campus. The court (at p. 144), in order to "confine the statute within constitutional limits and to avoid the penalization of free speech," interpreted the words, "wilfully disrupted," to apply in a limited situation consistent with the legislative purpose, and (p. 145) to require notice and hearing of alleged misconduct before issuance of any exclusion order unless the administrator makes certain findings. The *Braxton* case pertained to a penal statute and the removal of persons from areas of the campus open to the general public. Here, the question pertains to the policy and regulations of defendants not to permit persons to invade the privacy of students in their living quarters.

In *James* v. *Nelson, supra,* (349 F.Supp. 1061), the matter was before the court on a motion for a temporary restraining order. Plaintiffs alleged that they were participating in an election campaign and that they were prevented from canvassing voters in student dormitories at Northern Illinois University. A regulation of the university forbade solicitation of any kind on student-living floors. A second regulation which was to go

into effect, if adopted by two-thirds vote of the students residing in each dormitory, was that canvassing would be permitted on the "student living floors" on certain conditions (e.g., canvassers must register and obtain a letter of authorization for a certain time period, canvassing limited to certain hours, no solicitation of contributions, "no canvassing" signs on doors of students and requests to leave must be honored, certain areas were "off limits"). Plaintiffs contested the two-thirds voting requirement of the proposed canvassing regulation, urging that it effectively prohibited canvassing and therefore unduly limited their constitutional rights to freedom of association and expression. The federal district court (p. 1062) agreed with plaintiff's contention, issued the temporary restraining order, and said: "The Court emphasizes, however, that it does not find that, and indeed no challenge has been made that, the eight numbered conditions and restrictions set forth in that statement are in any way unreasonable or beyond the powers of the university administration to impose in the interests of good order and the safety and comfort of the student body."

The present case is distinguishable from the *James* case, just cited. In the present case there was a trial wherein there was evidence as to the "general layout" of the dormitories, and evidence as to the policies and regulations of the university for enhancing the privacy and safety of the students, and evidence as to the conditions under which regulation of students was permitted. The judge, pursuant to a stipulation, viewed one of the "typical" dormitories. In the present case it was concluded that the conditions of the permission granted by defendants for registration of the students were reasonable; whereas, the court in the *James* case emphasized that it did not make any finding as to whether the proposed restrictions by the university were reasonable.

As above shown, section 204.5 of the Elections Code states that a deputy registrar of voters may secure registrations "at places of residence" of the persons to be registered. In the instant case the result depends upon the definition of "places of residence" as that expression is used in the code section just referred to, and also upon the application of the concept of "adequate alternative avenues" for the exercise of rights to voter franchise applied in *Diamond* v. *Bland,* 11 Cal.3d 331 [113 Cal.Rptr. 468, 521 P.2d 460]. Since regulations governing the use of state property may not contravene a statute, the validity of the university's policy as to canvassing for voter registrations on upper floors of

dormitories must be tested against the provisions of said section 204.5. It appears that there is no inconsistency between the statute and the university policy. There was no request for a finding of fact on the issue of definition of "residence" as pertinent to the circumstances herein. In view of the judgment, however, an implied finding is that "residence" of a student living in a dormitory includes the lobby of the building. That finding is supported by substantial evidence, including the judge's view of the premises. If that definition is applied, the appellants were permitted by the university policy to secure registrations "at places of residence of the persons to be registered." Also, such permission by the university to conduct voter registration in the lobbies is a valid alternative to allowing solicitation of registration in student rooms.

Even if it be assumed that a less intrusive means of regulation of voter registration is available to the university, the California Supreme Court apparently rejected the least intrusive test in *Diamond* v. *Bland, supra* (11 Cal.3d 331). There it was held that persons seeking signatures on an initiative petition could be barred from a privately owned but publicly accessible shopping center because the solicitors possessed "alternative, effective channels of communication . . . [to] customers and employees of the center . . . on . . . [the] public sidewalks, parks, and streets adjacent to the Center . . . ." (P. 335.) It is significant that the court therein did not require that the alternative means be as effective as solicitation within the shopping center, but only that it be effective.

In the instant case solicitation of voter registration in the lobbies was found, in essence, to be effective by the trial court and that finding has substantial evidentiary support. Since voter registration and solicitation of signatures on an initiative petition are similar, the case of *Diamond* v. *Bland, supra,* compels validation of the regulation adopted by the university.

The judgment is affirmed.

Lillie, J., and Thompson, J., concurred.

A petition for a rehearing was denied August 19, 1975, and appellants' petition for a hearing by the Supreme Court was denied September 17, 1975.